Dean Peter DeBRUYNE and Evelyn S. Carlyle, individually and on behalf of all others similarly situated, Plaintiffs,

v.

The EQUITABLE LIFE ASSURANCE SOCIETY OF the UNITED STATES and Equitable Capital Management Corporation, Defendants.

No. 88 C 10098.

United States District Court, N.D. Illinois, E.D.

Sept. 6, 1989.

Edward T. Joyce, Steven J. Rotunno, Joyce & Kubasiak, P.C., Lawrence W. Schad, Stephen B. Diamond, Andrew H. Haber, Beeler, Schad & Diamond, P.C., David A. Genelly, Fishman & Merrick, P.C., Chicago, Ill., for plaintiffs.

Donald G. Kempf, Jr., P.C., James P. Cusick, Kirkland & Ellis, Chicago, Ill., for defendants.

## MEMORANDUM ORDER

BUA, District Judge.

When the stock market crashed in October 1987, a retirement fund in which plaintiffs had invested suffered severe losses. Plaintiffs claim that defendants, the managers of the fund, followed an imprudent investment policy that left the fund particularly vulnerable to a sharp decline in the stock market. Plaintiffs also allege that defendants' investment strategy did not comport with defendants' description of the fund to investors. Based on these allegations, plaintiffs assert that defendants violated various federal laws regulating retirement plans and securities. In addition, plaintiffs claim that defendants violated a New York insurance statute. In response to plaintiffs' claims, defendants have moved for summary judgment on all six counts of plaintiffs' complaint. For the reasons stated herein, this court grants defendants' motion for summary judgment.

## FACTS

In order to satisfy the retirement needs of its members, the American Bar Association ("ABA") formed a corporation called the American Bar Retirement Association ("ABRA"). For a number of years, the ABRA has offered ABA members the option of participating in a retirement benefits program now known as the ABA Members Retirement Plan ("the ABA Plan"). To fund the ABA Plan, the ABRA entered into a group annuity contract with the Equitable Life Assurance Society of the United States ("Equitable Life"), a mutual life insurance company based in New York.

Starting in 1986, participants in the ABA Plan could choose to invest in any or all of

seven accounts established by Equitable Life. To accommodate risk-averse investors, Equitable Life set up three ABA Plan accounts that guarantee a return on investment. For those ABA Plan participants who wish to pursue a more aggressive investment strategy, Equitable Life established the Real Estate Fund, which produces income through investment in real property. In addition, Equitable Life created three equity accounts: the Aggressive Equity Fund, the Balanced Fund, and the Growth Equity Fund. Equitable Life actively manages these equity accounts by investing in common stock and other equity securities. Such investments create the potential for more substantial returns than the guaranteed accounts could possibly generate. At the same time, unlike the guaranteed accounts, the equity funds do not completely insure investors against the risk of loss. Of the three equity accounts offered under the ABA Plan, only the Balanced Fund invests in debt securities as a hedge against losses that might result from equity investments. Equitable Life and its wholly owned subsidiary, Equitable Capital Management Corporation ("Equitable Capital"), manage all of the assets invested in the Balanced Fund.

In November 1977, Miller, Hickey & DeBruyne, Ltd., a corporate law firm in Rockford, Illinois, adopted the ABRA Master Profit Sharing Plan, the retirement benefits program that later became known as the ABA Plan. Under the terms of its participation agreement with the ABRA, the Miller firm agreed to be bound by the terms and provisions of the ABRA's plan and trust. Only employees of Miller, Hickey & DeBruyne, Ltd. could participate in the firm's newly adopted profit sharing plan. The plan attracted several participants, including plaintiff Dean Peter DeBruyne, a partner in the Miller firm, and plaintiff Evelyn Carlyle, a legal secretary who worked at the firm.

In 1982, the partners in Miller, Hickey & DeBruyne, Ltd. decided to dissolve the firm. Then Francis E. Hickey, a partner in the Miller firm until its dissolution, established his own law firm. This new firm, Francis E. Hickey, Ltd., employed Carlyle as a legal secretary. The Hickey firm retained the same ABRA retirement plan that the Miller firm had created in 1977. Only Hickey and Carlyle participated in the Hickey firm's profit sharing plan.

Following the dissolution of the Miller firm, DeBruyne formed a new corporate law firm called DeBruyne & Roman, P.C. In May 1982, DeBruyne & Roman, P.C. adopted the ABRA Master Profit Sharing Plan. At the time it adopted this retirement plan for its employees, DeBruyne & Roman, P.C. agreed to be bound by the terms and provisions of the ABRA's plan and trust. When DeBruyne elected to participate in his new firm's profit sharing plan, the ABRA transferred DeBruyne's account in the Miller firm's plan to the newly established DeBruyne & Roman, P.C. plan.

After the dissolution of DeBruyne & Roman, P.C. in early 1986, DeBruyne formed another law firm called Peter DeBruyne, P.C. Since the inception of Peter DeBruyne, P.C., DeBruyne has served as the firm's president and sole stockholder. In December 1986, Peter DeBruyne, P.C. executed a participation agreement adopting the ABA Plan. This participation agreement expressly provided that Peter DeBruyne, P.C. was adopting a standardized profit sharing plan under the ABA Plan and its related trust. Although Peter DeBruyne, P.C. offered its profit sharing plan to all of its employees, only DeBruyne himself chose to participate in the plan. Once DeBruyne indicated his intention to participate in the new plan, the ABRA transferred DeBruyne's account in the DeBruyne & Roman, P.C. plan to the Peter DeBruyne, P.C. plan. From 1986 through 1988, DeBruyne remained the sole participant in the profit sharing plan established by Peter DeBruyne, P.C.

During the first years of their participation in the ABRA's retirement plan, DeBruyne and Carlyle invested exclusively in guaranteed accounts. Then in 1986 and 1987, both plaintiffs decided to invest in the ABA Plan's Balanced Fund. In August 1986, Carlyle transferred $2,352 from her 2-4 Year Guaranteed Rate Account to the Balanced Fund. In August 1987, Carlyle

transferred an additional $2,667 from her 2–4 Year Guaranteed Rate Account to the Balanced Fund. On May 4, 1987, De-Bruyne transferred $20,000 from his Money Market Guarantee Account to the Balanced Fund. On July 7, 1987, DeBruyne transferred another $20,000 from his Money Market Guarantee Account to the Balanced Fund. At the time they invested in Equitable Life's Balanced Fund, plaintiffs had the option of investing in any of the various accounts offered under the ABA Plan. Moreover, plaintiffs' investment in the Balanced Fund did not circumscribe their future investment options. Under the provisions of the ABA Plan, plaintiffs could have withdrawn or transferred their money from the Balanced Fund at any time.

Both before and after they decided to invest in the Balanced Fund, plaintiffs received various reports, prospectuses, and other publications from Equitable Life. These documents described the different investment options available under the ABA Plan. In these publications, Equitable Life stated that the Balanced Fund would seek to accomplish the twin goals of achieving a high rate of return while avoiding the volatility that plagues pure equity funds. Equitable Life explained that the Balanced Fund would attempt to meet its dual objective through investment in a diversified portfolio of equity and debt securities. Noting that the Balanced Fund's investment in debt would tend to reduce the Fund's volatility, Equitable Life characterized the Balanced Fund as the least volatile of the ABA Plan's equity funds. Nonetheless, Equitable Life cautioned investors that the Balanced Fund's volatility could vary depending on market conditions. In addition, Equitable Life repeatedly warned that it could not guarantee that the Balanced Fund would succeed in generating income or attaining its objectives.

During the time that plaintiffs participated in the Balanced Fund, defendants Equitable Life and Equitable Capital determined the mix of investments in the Balanced Fund's portfolio. According to the reports that Equitable Life sent to ABA Plan participants, defendants actively managed the Balanced Fund's portfolio. Consequently, Equitable Life anticipated that the proportion of the Balanced Fund's assets invested in equity would vary in accordance with economic conditions, stock prices, interest rates, and other relevant considerations. Equitable Life also indicated that defendants' active management of the Balanced Fund could entail investment in both short-term and long-term debt. Although the composition of the Balanced Fund's portfolio frequently fluctuated, published descriptions of the portfolio in 1985 consistently reported an average investment of about 80 percent of the Balanced Fund's assets in equity securities (including convertibles).

For the first three quarters of 1987, stock prices rose dramatically. Taking advantage of this upward surge in the stock market, defendants invested a very large proportion of the Balanced Fund's assets in common stock and other equity securities. In the ABA Plan's 1987 Semi–Annual Report, which plaintiffs received in September 1987, Equitable Life forecast that stock prices would continue to rise. At the same time, Equitable Life predicted that bond prices would stabilize and decline. Based on these projections, Equitable Life informed investors that the Balanced Fund's portfolio, although hedged with convertibles to reduce volatility, would remain heavily weighted in equities.

Suddenly, on October 19, 1987, the Dow Jones Industrial Average plummeted more than 500 points, the largest one-day decline in the stock market's history. Due to its heavy investment in equity securities, the Balanced Fund immediately felt the reverberations of the stock market crash. The Balanced Fund's net asset value fell from $15.11 per unit on October 15, 1987 to $12.44 per unit when the market closed on October 19, 1987. Shortly thereafter, in an Insider's Update dated October 1987, Equitable Life notified ABA Plan participants of the Balanced Fund's precipitous decline. DeBruyne received this Insider's Update in November 1987.

Upon learning of the sharp drop in the Balanced Fund's value, DeBruyne began to suspect that defendants had not maintained an appropriate balance between equity and

debt in the Fund's investment portfolio. In a February 15, 1988 letter to the Trustees of the ABA Plan, DeBruyne inquired about the percentage of Balanced Fund assets invested in stocks and bonds on the day of the stock market crash. One month later, DeBruyne received a letter from William J. Cofone, a Senior Vice President at Equitable Life. Cofone's letter, dated March 24, 1988, indicated that the Balanced Fund's portfolio reflected an asset mix of 81 percent equities (including convertibles) and 1 percent bonds at the time of the stock market crash. After reviewing Cofone's letter, DeBruyne concluded that defendants had not invested sufficiently in debt securities to keep the Balanced Fund in balance. Based on this conclusion, DeBruyne and Carlyle filed suit against Equitable Life and Equitable Capital on November 30, 1988.

## DISCUSSION

Plaintiffs' complaint asserts six claims against defendants. In Counts I and II, plaintiffs contend that defendants breached the fiduciary duties imposed by section 404 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1104. Counts III, IV, and V allege violations of various provisions of the federal securities laws. Finally, in Count VI, plaintiffs claim that defendants violated section 4226 of the New York Insurance Law. Defendants have moved for summary judgment on all six of plaintiffs' claims. In evaluating defendants' motion, this court will first consider defendants' challenges to plaintiffs' ERISA claims. The court will then examine defendants' attacks on plaintiffs' federal securities claims. Lastly, the court will assess the viability of plaintiffs' claim under the New York Insurance Law.

### I. ERISA Claims

#### A. Failure to Comply with Plan Documents

■ According to Count I of plaintiffs' complaint, defendants violated section 404(a)(1)(D) of ERISA. Under this statutory provision, a fiduciary must administer a retirement plan "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). Plaintiffs argue that defendants did not manage the Balanced Fund in the manner described by the ABA Plan's semiannual and annual reports and prospectuses. Characterizing these reports and prospectuses as documents governing the ABA Plan, plaintiffs contend that defendants' deviation from these documents violated ERISA. Defendants contend, however, that annual reports and prospectuses do not constitute plan documents under ERISA.

Even assuming that plaintiffs have properly identified the documents governing the ABA Plan, Count I fails to state a claim under ERISA because defendants adhered to the investment strategy outlined in the ABA Plan's periodic reports and prospectuses. Just as the reports and prospectuses had promised, defendants invested a substantial portion of the Balanced Fund's assets in debt securities during October 1987. At that time, the Balanced Fund's portfolio included a variety of debt securities: investments in convertible debt, nonconvertible debt, short-term debt, and cash. From October 9, 1987 to October 23, 1987, the percentage of Balanced Fund assets invested in debt ranged from 29.3 percent to 44.8 percent. Affidavit of Franklin Kennedy, III, Senior Vice President, Equitable Capital. When the stock market opened on October 19, 1987, the percentage of Balanced Fund assets invested in debt stood at 30.6 percent. *Id.*

Plaintiffs complain about the Balanced Fund's minimal investment in bonds at the time of the stock market crash. They argue that the plan documents required the Balanced Fund's managers to make a substantial investment in bonds. This argument rests on a basic misinterpretation of the ABA Plan's reports and prospectuses. These documents did not state that the Balanced Fund's portfolio would include a substantial investment in bonds. Rather, these documents declared that defendants would invest a substantial portion of Balanced Fund assets in "debt securities." As the prospectuses explained, these "debt securities" could include not only bonds, but also notes, debentures, equipment trust certificates, and debt instruments with equity features. *See* ABA Plan, Prospectus 23 (May 1, 1987) (hereinafter "1987 Pro-

spectus"); ABA Plan, Prospectus 24 (May 1, 1986) (hereinafter "1986 Prospectus"); ABA Plan, Prospectus 32 (April 19, 1985) (hereinafter "1985 Prospectus"). Thus, even assuming that the prospectuses govern the management of the Balanced Fund, these documents authorized defendants to invest in convertible as well as nonconvertible debt. Furthermore, from 1985 through 1987, the prospectuses consistently indicated that the Balanced Fund's portfolio could include both short-term and long-term debt securities: "The average maturity of the debt securities held by the Balanced Fund will vary according to market conditions and the stage of interest rate cycles." 1987 Prospectus at 23; 1986 Prospectus at 24; 1985 Prospectus at 32.

Clearly, under the terms of the prospectuses, defendants possessed broad discretion to invest the Balanced Fund's assets in a wide range of debt securities. Defendants properly exercised that discretion in October 1987. In the ABA Plan's September 1987 semi-annual report, Equitable Life predicted that the bond market would soon experience a period of stagnation. See ABA Plan, 1987 Semi–Annual Report 5 (1987). Based on this forecast, defendants decided not to invest heavily in bonds in October 1987. Instead, defendants invested substantially in convertibles and short-term debt securities as a hedge against volatility. In retrospect, as plaintiffs point out, a more significant investment in bonds would have tempered the Balanced Fund's sharp decline in value. Nonetheless, while a different investment strategy might have mitigated the losses suffered by the Balanced Fund, defendants' management of the Fund's portfolio fully complied with the reports and prospectuses that plaintiffs characterize as plan documents. In accordance with these documents, defendants invested a substantial portion of Balanced Fund assets in various types of debt securities. Consequently, defendants' conduct did not violate section 404(a)(1)(D) of ERISA.

### B. Breach of Fiduciary Duty of Care

 In addition to requiring fiduciaries to comply with plan documents, ERISA imposes several other fiduciary duties on the managers of retirement plans. Pursuant to section 404(a)(1)(B) of ERISA, 29 U.S.C. § 1104(a)(1)(B), a fiduciary owes a duty of care to all participants in a retirement plan. In order to fulfill this duty of care, a fiduciary must manage a retirement plan "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B) (1982). Count II of plaintiffs' complaint asserts that defendants breached their fiduciary duty of care by failing to invest a substantial percentage of the Balanced Fund's assets in debt securities before the stock market crash.

In order to establish that defendants breached the fiduciary duty of care imposed by ERISA, plaintiffs must demonstrate that defendants managed the Balanced Fund's portfolio imprudently. At this stage of the litigation, plaintiffs need not produce conclusive evidence of defendants' imprudence. Nonetheless, in response to defendants' motion for summary judgment, plaintiffs must present at least some evidence supporting their assertion that defendants invested imprudently. The Supreme Court recently interpreted the Federal Rules of Civil Procedure to require "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Therefore, unless plaintiffs have offered some evidence of defendants' imprudence, plaintiffs' claim under Count II cannot survive defendants' motion for summary judgment.

Thus far, plaintiffs have proffered only one piece of evidence purporting to show a breach of the duty of care: the affidavit of Martin D. Hanan, president of Business Valuation Services, Inc. Hanan, a financial analyst, has prepared a comprehensive evaluation of the Balanced Fund's performance from 1980 to 1987. Based on his

calculations, Hanan estimated that the ABA Plan's Balanced Fund suffered a greater loss in 1987 than virtually any other balanced fund experienced during that year. Hanan also concluded that from 1980 to 1986, the volatility of the ABA Plan's Balanced Fund far exceeded the suscept: "ity of other balanced funds to market fluctuations. Even assuming the accuracy of Hanan's analysis, however, his observations about the Balanced Fund's profitability and volatility do not help to resolve the issue of whether defendants breached their duty of care by pursuing an imprudent investment strategy in October 1987. Hanan's affidavit does not even discuss the Balanced Fund's volatility at the time the stock market crashed. As for Hanan's documentation of the Balanced Fund's losses in 1987, this court cannot properly gauge the prudence of defendants' investments by focusing exclusively on the results of those investments. See GIW Industries, Inc. v. Trevor, Stewart, Burton & Jacobsen, Inc., 10 Employee Benefits Cas. (BNA) 2074, 2077 (S.D.Ga.1989). Under ERISA's prudence standard, the mere fact that the Balanced Fund declined in value does not justify the conclusion that defendants breached the fiduciary duty of care: "The application of ERISA's prudence standard does not depend upon the ultimate outcome of an investment, but upon the prudence of the fiduciaries under the circumstances prevailing when they make their decision and in light of the alternatives available to them." Marshall v. Glass/Metal Association & Glaziers & Glassworkers Pension Plan, 507 F.Supp. 378, 384 (D.Haw.1980). Consequently, this court must grant summary judgment for defendants on Count II unless plaintiffs have produced some evidence that defendants invested imprudently in light of prevailing market conditions at the time of defendants' investments. To date, plaintiffs have presented no such evidence.

In his affidavit, Hanan never bothers to consider the market conditions that formed the backdrop for defendants' investment strategy in October 1987. Instead, Hanan simply avers that defendants should have increased the Balanced Fund's investment in government bonds in 1987 while simultaneously reducing the Fund's holdings in common stock. To obtain this rather unremarkable insight, plaintiffs need not have consulted an experienced financial analyst. Given the benefit of hindsight, even a complete novice at financial planning would conclude that defendants should not have maintained a substantial investment in stock at the time the stock market crashed. In applying ERISA, however, this court cannot judge defendants' investment decisions from the vantage point of hindsight. Rather, the court must consider the prudence of defendants' conduct at the time they made the investments. See American Communications Association, Local 10 v. Retirement Plan for Employees of RCA Corp. and Subsidiary Companies, 488 F.Supp. 479, 483 (S.D.N.Y.), aff'd, 646 F.2d 559 (2d Cir.1980).

In the ABA Plan's September 1987 semiannual report, Equitable Life projected a continued upswing in the stock market and stagnation in the bond market for the last quarter of 1987. At that time, considering the performance of the markets for the first three quarters of 1987, Equitable Life's financial forecast for the year's final quarter seemed completely reasonable. Moreover, nothing in Hanan's affidavit has cast doubt on the prudence of Equitable Life's September 1987 market projections. Based on those projections, defendants chose not to invest substantially in the sluggish bond market in the first weeks of October 1987. Instead, defendants decided to maintain the Balanced Fund's substantial debt position by investing in convertible debt instruments. In fact, throughout the first nine months of 1987, defendants had invested a significant portion of the Balanced Fund's assets in short-term debt securities and convertible bonds. Because they consist of both a debt component and an equity feature, convertibles offered a particularly attractive investment for the Balanced Fund's purposes in the months preceding October 1987. Defendants reasonably believed at the time that investment in convertibles would help to achieve both of the Balanced Fund's objectives. In defendants' view, the convertibles' equity feature would generate additional capital growth if the stock market continued to

rise, while the convertibles' debt component would serve as a hedge against volatility in the event of a stock market downturn.

Under normal circumstances, the convertible debt securities held by the Balanced Fund would have reduced the Fund's vulnerability to major fluctuations in stock prices. The October 1987 stock market crash, however, destroyed the capability of convertibles to act as a buffer against the risk of loss. As William Cofone, a Senior Vice President at Equitable Life, explained in his 1988 correspondence with DeBruyne, the stock market's plunge triggered the collapse of convertible markets. As a result, the convertibles held by the Balanced Fund could not protect the Fund from the effects of the stock market's rapid descent. Hanan has not challenged Cofone's explanation of why the convertibles failed to stem the decline in the Balanced Fund's value.

As Cofone's reply to DeBruyne indicates, defendants take the position that the Balanced Fund's losses in October 1987 stemmed not from mismanagement of the Fund, but from an unexpected market cataclysm. Defendants persuasively argue that the prevailing financial conditions in early October 1987 justified defendants' investment strategy for the Balanced Fund at that time. In response, plaintiffs have proffered no specific evidence to refute defendants' assertion that the Balanced Fund was prudently managed on the eve of the stock market crash. Hanan merely asserts that defendants did not manage the Balanced Fund prudently because they failed to invest substantially in government bonds and fixed income securities. Standing alone, Hanan's conclusory assertion of imprudence does not create a genuine issue of material fact, an element that plaintiffs must establish in order to defeat defendants' motion for summary judgment. *See First Commodity Traders v. Heinold Commodities*, 766 F.2d 1007, 1011 (7th Cir. 1985). Obviously, the Balanced Fund would have achieved better results in October 1987 if defendants had managed the Fund in the manner suggested by Hanan. Nonetheless, in light of financial conditions on the eve of the stock market crash, defendants appear to have acted prudently when they adopted the alternative strategy of investing in convertibles rather than government bonds. In the weeks preceding October 19, 1987, defendants invested substantially in convertibles and short-term debt instruments with the reasonable expectation that these debt securities would reduce the Balanced Fund's volatility. Only the stock market crash and the consequent collapse of convertible markets thwarted defendants' investment strategy. Plaintiffs have presented no evidence that suggests a contrary conclusion. Thus, in the course of managing the Balanced Fund, defendants made one primary mistake: They failed to foresee a stock market debacle that few financial experts had anticipated. This court simply cannot hold defendants liable for an inability to predict the stock market crash. The fiduciary duty of care requires prudence, not prescience.

Based on the financial conditions that prevailed before the stock market crash, defendants have cogently contended that they discharged their duty of care under ERISA by managing the Balanced Fund prudently. Plaintiffs have produced no specific evidence to contradict defendants' position. Consequently, this court must enter summary judgment for defendants on Count II of plaintiffs' complaint.

## II. Federal Securities Claims

In Counts III, IV, and V of their complaint, plaintiffs assert claims based on various provisions of the federal securities laws. Count III alleges that defendants violated section 11 of the Securities Act of 1933, 15 U.S.C. § 77k. Count IV asserts a violation of section 12(2) of the 1933 Act, 15 U.S.C. § 77*l*(2). In Count V, plaintiffs claim that defendants contravened section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), as well as Securities and Exchange Commission ("SEC") Rule 10b–5, 17 C.F.R. § 240.10b–5. To maintain any of their claims under the securities laws, plaintiffs must produce some evidence that defendants made material misrepresentations about the Balanced Fund. Otherwise, this court must enter summary judgment for defendants on all three of plaintiffs' securities claims. *See*

*Gert v. Elgin National Industries,* 773 F.2d 154 (7th Cir.1985) (plaintiff failed to state a claim under Rule 10b–5 because she proffered no evidence of material misrepresentations); *Simpson v. Southeastern Investment Trust,* 697 F.2d 1257 (5th Cir. 1983) (plaintiffs could not sustain claims under section 12(2) of the 1933 Act and Rule 10b–5 without making some showing of material misrepresentations); *Greenapple v. Detroit Edison Co.,* 618 F.2d 198 (2d Cir.1980) (absent evidence of material misstatements or omissions, plaintiff had no cause of action under section 11 of the 1933 Act).

When they decided to participate in the Balanced Fund, plaintiffs relied upon Equitable Life's description of the Fund in various brochures, prospectuses, and annual reports. Plaintiffs now claim that defendants made numerous material misrepresentations when describing the Balanced Fund to ABA Plan participants. After scrutinizing defendants' public disclosures about the Balanced Fund, however, this court finds no basis for plaintiffs' allegations of misrepresentation.

Plaintiffs initially complain that defendants pursued an investment strategy inconsistent with the public portrayal of the Balanced Fund's investment mix. In a number of publications, Equitable Life had indicated that the Balanced Fund's portfolio would include substantial investments in debt securities. Plaintiffs contend that when the stock market crashed, the Balanced Fund's investment mix did not comport with Equitable Life's previous representations. Specifically, plaintiffs assert that defendants failed to maintain substantial debt holdings in the Balanced Fund's portfolio in October 1987. This assertion is simply incorrect. According to the affidavit of Franklin Kennedy, III, the Equitable Capital executive who supervises the management of the Balanced Fund, defendants had invested more than 30 percent of the Balanced Fund's assets in various types of debt securities at the time of the stock market crash. Plaintiffs do not contest Kennedy's calculations. Instead, plaintiffs maintain that they expected defendants to invest more substantially in government bonds and long-term debt instruments.

The published depictions of the Balanced Fund, however, never guaranteed that defendants would make significant investments in government bonds or long-term debt. Equitable Life simply stated that the Balanced Fund's portfolio would include substantial investments in debt securities. The ABA Plan's prospectuses from 1985 to 1987 repeatedly disclosed that the debt securities held by the Balanced Fund could include not only government bonds and long-term debt, but also convertible bonds and short-term debt. Moreover, the prospectuses clearly indicated that the portfolio manager would possess broad discretion in determining the precise mix of the Balanced Fund's investments. Exercising that discretion, defendants decided to invest in convertibles rather than government bonds in October 1987. Employing this investment strategy, defendants continued to invest a substantial portion of the Balanced Fund's assets in debt securities. Thus, at the time of the stock market crash, the composition of the Balanced Fund's portfolio did not conflict with Equitable Life's previous representations.

Plaintiffs argue, however, that they reasonably expected that a retirement plan called a "balanced fund" would maintain some sort of equipoise between its stock and bond investments. According to Hanan, the ABA Plan's Balanced Fund was "out of balance" in October 1987 because defendants had invested only 15 percent of the Fund's assets in nonconvertible debt securities. As further evidence of the Fund's disequilibrium, Hanan observes that defendants had invested less than 1 percent of the Fund's assets in long-term debt on the eve of the stock market crash. Based on Hanan's assertion of imbalance, plaintiffs contend that defendants deceptively applied the label "balanced fund" to a retirement plan that did not counterbalance its stock holdings with a substantial investment in bonds. This argument rests on the mistaken notion that defendants could only "balance" the Balanced Fund by investing substantially in nonconvertible long-term debt. On the contrary, the SEC's definition of "balance" hinges on the percentage of a fund's assets invested in fixed income sen-

ior securities. According to the SEC, an investment fund that purports to be "balanced" should maintain at least 25 percent of the value of its assets in fixed income senior securities. Guidelines for SEC Form N-1A, Guide 4, 5 Fed.Sec.L.Rep. (CCH) ¶ 51,208, at 39,253 (Nov. 9, 1987) (hereinafter "Form N-1A, Guide 4"). For the purpose of determining whether a fund meets the SEC's standard of balance, "fixed income senior securities" can include not only government bonds and long-term debt, but also some classes of preferred stock and the debt portion of convertible securities. *See* Investment Company Act of 1940, 15 U.S.C. § 80a-18(g) (1982); Form N-1A, Guide 4. Applying the SEC's guidelines for calculating whether a fund is balanced, Kennedy has computed that defendants invested more than 25 percent of the Balanced Fund's assets in fixed income senior securities for the two-week period from October 9, 1987 to October 23, 1987. Once again, plaintiffs do not quarrel with Kennedy's calculations. Plaintiffs merely assert that defendants violated the SEC's prohibition against using a deceptive or misleading name for an investment fund. *See* Investment Company Act of 1940, 15 U.S.C. § 80a-34(d) (1982); Guidelines for SEC Form N-3, Guide 1, 5 Fed.Sec.L.Rep. (CCH) ¶ 51,247, at 39,392 (March 1, 1989). Contrary to plaintiffs' assertion, the SEC would hardly consider defendants' use of the term "balanced fund" misleading. After all, the ABA Plan's Balanced Fund fit the SEC's definition of "balance" at the time of the stock market crash.

Ultimately, plaintiffs have failed to substantiate their allegation that the term "balanced fund" necessarily implied a dramatically different investment policy from the strategy employed by defendants. Hanan claims that a "typical" balanced fund would not have maintained the high level of volatility and the low level of long-term debt investment evinced by the ABA Plan's Balanced Fund. Plaintiffs offer no evidence, however, that Hanan's characterization of a typical balanced fund reflects a commonly accepted view within the financial community. In fact, financial experts' varying definitions of "balance" belie Hanan's implication that his conception of a

"balanced fund" mirrors investors' common understanding of the term. Several balanced funds, including Alliance Balanced Shares, Inc., Fidelity Balanced Fund, and Dodge & Cox Balanced Fund, have adopted the SEC's definition of "balance." These funds invest at least 25 percent of their assets in fixed income senior securities. By contrast, the Wall Street Journal requires a "balanced" fund to maintain an asset mix with a minimum investment of 25 percent in stocks and 25 percent in bonds. *See Mutual Fund Scorecard/Balanced,* Wall St.J., June 28, 1989, at C17. Lipper Analytical Services, Inc. has articulated yet another definition of the term "balanced fund." Under Lipper's definition, a balanced fund's portfolio should typically reflect a stock/bond ratio of approximately 60 percent/40 percent. Lipper Analytical Services, Inc., Mutual Fund Performance Analysis 2 (July 1989). Given the disparity in financial analysts' definitions of "balance," defendants' use of the term "balanced fund" did not justify plaintiffs' expectation that defendants would invest substantially in government bonds and long-term debt. Funds known as "balanced funds" often invest in a wide assortment of debt securities. Despite differences in the composition of their portfolios, these balanced funds share one common attribute: a substantial investment in debt. By maintaining substantial holdings in debt securities, the ABA Plan's Balanced Fund featured the one salient characteristic that defines a fund as "balanced." For this reason, the court rejects plaintiffs' claim that defendants' use of the name "balanced fund" was inherently misleading.

■ Although plaintiffs primarily base their securities claims on defendants' alleged mischaracterization of the Balanced Fund's investment mix, plaintiffs also allege that defendants made several other misrepresentations in violation of federal securities laws. For instance, plaintiffs claim that defendants vacillated when describing the role of convertibles in the Balanced Fund's portfolio. For the purpose of computing the percentage of Balanced Fund assets invested in equity, the ABA Plan's prospectuses included convertibles

**1352**

among the Fund's equity holdings. *See* 1987 Prospectus at 35; 1986 Prospectus at 35; 1985 Prospectus at 8. In another publication describing the Balanced Fund, however, defendants classified convertibles as debt. *See* ABA Members Retirement Program, How Your Investment Options Let You Tailor Your Retirement Program to Your Own Financial Goals 4 (May 1985) (hereinafter "1985 Brochure"). Plaintiffs vaguely allege that defendants' inconsistent classification of convertibles somehow misled investors in the Balanced Fund. Contrary to plaintiffs' assertion, this court finds nothing misleading about defendants' disclosures concerning the convertibles in the Balanced Fund's portfolio. While they may have appeared to vacillate when describing convertibles, defendants were in fact accurately portraying the dual nature of convertible securities, which feature both a debt component and an equity conversion privilege.

■ Plaintiffs also complain that defendants misinformed investors about the objectives underlying the Balanced Fund's debt investments. Based on the depiction of the Balanced Fund's objectives in the ABA Plan's 1985 prospectus, plaintiffs believed that the Balanced Fund's debt holdings would serve the sole purpose of increasing the Fund's current income. *See* 1985 Prospectus at 32. Following the stock market crash, in a May 1988 letter to DeBruyne, Cofone indicated that the primary objective of the Balanced Fund's bond investments was capital appreciation rather than income production. According to plaintiffs, Cofone's letter marked the first time that defendants had disclosed their aggressive bond investment policy. In making this allegation, plaintiffs conveniently ignore the 1986 and 1987 prospectuses. In those documents, Equitable Life clearly stated that the Balanced Fund would seek to achieve long-term capital growth by investments in longer-term fixed income securities. *See* 1987 Prospectus at 23; 1986 Prospectus at 24. Thus, long before the stock market crash, defendants informed ABA Plan participants that the bonds held by the Balanced Fund would serve mainly as a means of achieving capital growth.

■ Finally, plaintiffs contend that defendants made misrepresentations about the Balanced Fund's volatility. In the ABA Plan's 1985 and 1986 prospectuses, Equitable Life described the Balanced Fund as the least volatile of the ABA Plan's three equity funds. *See* 1986 Prospectus at 16; 1985 Prospectus at 7. Plaintiffs take issue with this characterization. Based on his analysis of the equity funds' performance from 1980 to 1986, Hanan has concluded that the Balanced Fund regularly demonstrated a higher level of volatility than either the Growth Equity Fund or the Standard & Poor's 500 Stock Index ("S & P 500"). Nonetheless, even assuming the accuracy of Hanan's analysis, defendants' published depiction of the Balanced Fund's volatility did not amount to a material misrepresentation. Equitable Life repeatedly tempered its representations concerning the Balanced Fund by warning investors that the Fund offered no guarantee of a particular level of volatility. Noting the Balanced Fund's changing portfolio mix, Equitable Life downplayed the usefulness of comparisons between the volatility rates of the Balanced Fund and the S & P 500. *See* 1987 Prospectus at 35; 1986 Prospectus at 35; 1985 Prospectus at 8. Moreover, in the ABA Plan's 1987 prospectus, Equitable Life expressly admonished investors that the degree of the Balanced Fund's volatility could vary depending on market conditions. *See* 1987 Prospectus at 16. Finally, and most importantly, throughout the period of plaintiffs' participation in the Balanced Fund, Equitable Life continually cautioned that it could not assure the equity funds' success in achieving any of their objectives. *See* 1987 Prospectus at 17, 21; 1986 Prospectus at 21; 1985 Prospectus at 30; *see also* 1985 Brochure at 4 ("The Balanced Fund carries no guarantees."). Consequently, although defendants indicated that they would strive to minimize the Balanced Fund's volatility, they also explicitly warned that they might not succeed in their efforts. Having received this admonition on several occasions, plaintiffs cannot now claim that defendants misled them about the Balanced Fund's potential susceptibility to market swings.

Despite their allegations of numerous misrepresentations regarding the Balanced Fund, plaintiffs cannot sustain their claims under the federal securities laws in light of the disclosures made in the ABA Plan's prospectuses. As those documents clearly revealed, defendants actively managed the Balanced Fund in such a manner that the Fund's equity investments often exceeded the Fund's debt investments by a significant margin. In the 1985 prospectus, Equitable Life reported an average investment of 80 percent of the Balanced Fund's assets in equity securities (including convertibles). *See* 1985 Prospectus at 8; *see also* ABA Members Retirement Program, Insider's Update (Dec.1985); ABA Members Retirement Program, Insider's Update (Aug.1985). Furthermore, the 1986 and 1987 prospectuses disclosed that the proportion of the Balanced Fund's assets invested in equity (including convertibles) had ranged from 43 percent to 94 percent. *See* 1987 Prospectus at 35; 1986 Prospectus at 35. In addition, a July 1987 publication informed ABA Plan participants that defendants had invested 69.5 percent of the Balanced Fund's assets in stocks as of June 30, 1987. *See* ABA Members Retirement Program, Insider's Update (July 1987). By publishing all of this information before the stock market crash, defendants adequately forewarned investors that the Balanced Fund could maintain sizable investments in common stock and other equity securities. Moreover, during their depositions, both DeBruyne and Carlyle admitted reading and understanding the published warnings that the Balanced Fund offered no assurance of attaining its objectives and no income guarantee. Deposition of Dean Peter DeBruyne, March 31, 1989, at 118, 206; Deposition of Evelyn Carlyle, March 22, 1989, at 235, 316. Fully aware that participation in the Balanced Fund entailed some risk, plaintiffs could have withdrawn their money from the Fund at any time prior to the stock market crash. Instead, they elected to remain participants in the Balanced Fund, apparently hoping to profit from the stock market's upward surge in 1986 and early 1987. Now, in the aftermath of the stock market crash, plaintiffs seek to make defendants the scapegoats for plaintiffs' own unfortunate investment decision. Considering the disclosures that defendants made to ABA Plan participants from 1985 through 1987, plaintiffs cannot plausibly claim ignorance of the risk involved in their investment.

### III. New York Insurance Law Claim

In Count VI of their complaint, plaintiffs allege that defendants violated section 4226 of the New York Insurance Law. Under this statutory provision, an insurer who is authorized to make annuity contracts in New York cannot issue any publications "misrepresenting the terms, benefits or advantages of any of its policies or contracts." N.Y.Ins.Law § 4226(a)(1) (McKinney 1985). Plaintiffs claim that defendants published various misrepresentations about the terms of the annuity contract governing the investment options under the ABA Plan. In the course of analyzing plaintiffs' securities claims, however, this court has already rejected all of plaintiffs' allegations that defendants made material misrepresentations to ABA Plan participants. Consequently, plaintiffs lack any foundation for their claim under the New York Insurance Law.

### CONCLUSION

For the foregoing reasons, the court grants defendants' motion for summary judgment on all six counts of plaintiffs' complaint.

IT IS SO ORDERED.