920 F.2d 457
 Fed. Sec. L. Rep. P 95,708, 13 Employee Benefits Ca 1193
Dean Peter DeBRUYNE and Evelyn S. Carlyle, individually and
on behalf of all others similarly situated,
Plaintiffs-Appellants,
v.
EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES and
Equitable Capital Management Corporation,
Defendants-Appellees.
 No. 89-3600.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 5, 1990.
Decided Dec. 14, 1990.
 
 Edward T. Joyce, Joyce & Kubasiak, Stephen B. Diamond, Lawrence W. Schad, Andrew H. Haber, Beeler, Schad & Diamond, and David A. Genelly, Fishman & Merrick, Chicago, Ill., for plaintiffs-appellants.
 James P. Cusick, Donald G. Kempf, Jr., and Jeffrey S. Powell, Kirkland & Ellis, Chicago, Ill., for defendants-appellees.
 Before BAUER, Chief Judge, WOOD, Jr., Circuit Judge, and PELL, Senior Circuit Judge.
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 Plaintiffs, two participants in a retirement benefits program, sought to hold their investment manager liable for losses incurred in the stock market crash of October 19, 1987. The district court granted defendants' motion for summary judgment on all counts of the complaint, and we affirm.
 
 I.
 A. Background
 
 2
 Plaintiffs DeBruyne and Carlyle were participants in the ABA Members Retirement Plan ("Plan"), a retirement benefits program sponsored by the American Bar Retirement Association ("ABRA"). The Plan is funded through a group annuity contract issued by Equitable Life Assurance Society of the United States, which also manages the annuity funds along with its wholly owned subsidiary, Equitable Capital Management Corporation (collectively, "Equitable").[1]
 
 
 3
 At all relevant times, the Plan allowed participants to choose from a variety of funds managed by Equitable. Some of these options guaranteed a fixed investment return. Other options did not guarantee a return but did hold out the potential for higher profits. This latter group of options included three "equity funds": the "Aggressive Equity Fund"; the "Growth Equity Fund"; and the "Balanced Fund." Plaintiffs invested in guaranteed accounts during their first years of participation, but later transferred money into the Balanced Fund.
 
 
 4
 The Balanced Fund, as described by Equitable, achieved a compromise between the equity-laden (but more precarious) Aggressive Equity and Growth Equity Funds and the relatively sedate (but likely less profitable) guaranteed account options. The method by which Equitable sought to accomplish this compromise was the creation of a fund that had a "balanced" portfolio of equity and debt securities. This balance, Equitable disclosed in its prospectuses, would include common stocks, publicly traded debt securities, and money market instruments. "Debt securities," as defined in its prospectuses, included an unspecified mix of long-term, short-term, and convertible debt. Equitable also repeatedly disclosed in its prospectuses and annual reports that the "mix" of securities in the Balanced Fund was determined by the portfolio manager and involved an actively managed and constantly changing blend of investments.[2]
 
 
 5
 In its 1985, 1986, and 1987 prospectuses, Equitable included a chart entitled "Investment Option Characteristics." In 1987, the chart disclosed that the "objective" for the Balanced Fund was a "[c]ompetitive return through a growth of capital and current income." The 1987 chart also listed the objectives of the other options and cautioned that "[t]here is no assurance that any of the investment objectives of the Funds will be achieved."
 
 
 6
 The 1985 and 1986 charts described the risk to principal of the Balanced Fund in the same manner as the risk to principal of the Growth Equity Fund. Those same charts described the volatility of the Balanced Fund as the "[l]owest of the three [equity] funds." In the 1987 prospectus, the risk to principal of the Balanced Fund was described as "[s]omewhat lower than [the] Growth Equity Fund" and Equitable described the Balanced Fund's volatility with the following phrase: "[g]enerally lower than pure equity funds, but degree may vary depending on market conditions." The 1987 disclosures about the other two equity funds generally spoke of higher risk and volatility.
 
 
 7
 In the first three quarters of 1987, the stock market continued to rise and the bond market remained sluggish. In a semiannual report that plaintiffs received in September 1987, Equitable forecast that stock prices would continue to rise and that bond prices would stabilize and decline. Based on these projections, the semiannual report informed investors that the balance of the Balanced Fund would tilt in favor of equity securities but would remain hedged with convertibles.
 
 
 8
 On October 19, 1987--Black Monday--the Dow Jones 30 Industrial Average suffered a cataclysmic one-day decline of over 508 points. The Balanced Fund was not immune to the chaos that ensued, and its investment portfolio--61.7% in common stock, 3.8% in convertible preferred stock, 12.7% in convertible debt, 3.5% in nonconvertible debt, and 18.3% in short-term debt and cash--substantially declined in value. The plaintiffs concluded that the substantial losses belied Equitable's statements and duties with respect to the balance, risk to principal, and volatility of the Balanced Fund.[3] On November 30, 1988, they turned to the courts for redress.
 
 
 9
 The plaintiffs' complaint contained six counts. Count I charged Equitable with a breach of section 404(a)(1)(D) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. Sec. 1104(a)(1)(D), for its alleged failure to manage the Balanced Fund "in accordance with the documents and instruments governing the plan." Count II charged Equitable with a violation of section 404(a)(1)(B) of ERISA, 29 U.S.C. Sec. 1104(a)(1)(B), for its alleged failure to manage the Balanced Fund "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." Counts III, IV, and V charged Equitable with violations of sections 11 and 12(2) of the Securities Act of 1933 (" '33 Act"), 15 U.S.C. Secs. 77k, 77l (2); section 10(b) of the Securities Act of 1934 (" '34 Act"), 15 U.S.C. Sec. 78j(b); and rule 10b-5, 17 C.F.R. Sec. 240.10b-5, for its alleged material misrepresentations. Count VI, invoking the doctrine of pendent jurisdiction, charged Equitable with a violation of section 4226 of the New York Insurance Law, N.Y. INS. LAW Sec. 4226(a)(1), for its alleged misrepresentation of the "terms, benefits or advantages of its policies or contracts." The plaintiffs also sought class certification.
 
 B. District Court Proceedings
 
 10
 The proceedings that followed before the district court were relatively short-lived, but notable. On January 24, 1989, at the first status hearing, Equitable asked the district court for a period of time in which to conduct limited discovery and file a comprehensive motion to dismiss. At that same hearing, plaintiffs requested permission to conduct discovery on class certification issues and promised to file a motion for class certification on the same day that Equitable filed its motion. The judge granted both requests and incorporated counsels' representations into an order.
 
 
 11
 On April 27, 1989, Equitable filed a comprehensive motion for summary judgment. Contrary to their promise and the order of the district court, plaintiffs filed nothing. Nor had they used their time to seek discovery for their class certification motion.
 
 
 12
 On May 25, almost one month after Equitable's motion was filed, plaintiffs filed a motion for additional time in which to conduct discovery. This motion, as later admitted by plaintiffs' counsel, was deficient[4] for its failure to include a rule 56(f) affidavit.[5] Furthermore, plaintiffs' counsel failed to appear before the district court to argue the motion at the time that they themselves had requested.
 
 
 13
 After the district court denied the May 25 motion, plaintiffs thereafter filed a motion for reconsideration on June 8, 1989. This motion included a rule 56(f) affidavit, but it failed to explain why an affidavit had not been attached to the May 25 motion or why such an affidavit could not have been attached to the May 25 motion. Moreover, it did not explain why plaintiffs' counsel had failed to appear before the district court on May 25.[6]
 
 
 14
 After the district court denied the June 8 motion, plaintiffs filed their answer to Equitable's motion for summary judgment. Accompanying their answer memorandum was the affidavit of the plaintiffs' expert, Hanan. Hanan's affidavit first compared the percentage loss of the Balanced Fund with the percentage gains and losses of twenty-two other publicly traded balanced funds. Hanan then presented calculations with respect to the investment risk[7] of the Balanced Fund for the periods 1980-84, 1980-85, and 1980-86, but did not present calculations incorporating the year 1987. As to 1987, Hanan stated only that the Balanced Fund lost money, that the Balanced Fund was neither prudently invested nor "balanced" within the understanding of "the average investor or typical plan manager managing a mutual fund," and that the "typical balanced fund portfolio manager" would have followed a different course of action in 1987.
 
 
 15
 On September 6, 1989, the district court decided the summary judgment motion in favor of Equitable on all counts of the complaint. DeBruyne v. Equitable Life Assur. Soc'y of United States, 720 F.Supp. 1342 (N.D.Ill.1989). In response, plaintiffs filed a notice of appeal and a motion for reconsideration. After the district court denied plaintiffs' motion for reconsideration, plaintiffs appealed it as well. For the following reasons, we affirm the judgment of the district court on both the motion for summary judgment and the motion for reconsideration.
 
 II.
 A. Jurisdiction
 
 16
 Because the district court failed to resolve the class certification aspects of the complaint prior to making a conclusive determination on the merits, we must determine, as an initial matter, whether the decision before us is "final." While the district court's failure to determine the nature of this action is problematic under rule 23 of the Federal Rules of Civil Procedure--which requires the district court to decide the question of class certification "as soon as practicable"[8]--this problem alone will not deprive us of jurisdiction. See Lorance v. AT & T Technologies, Inc., 827 F.2d 163, 165 n. 1 (7th Cir.1987), aff'd, 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989); Hickey v. Duffy, 827 F.2d 234, 238 (7th Cir.1987). Instead, we concern ourselves with the issue of whether the district court has reserved the class certification issue for later determination. See Bieneman, 838 F.2d at 963; Glidden v. Chromalloy Am. Corp., 808 F.2d 621, 622-23 (7th Cir.1986). Here, the district court believed that it could avoid a decision on class certification by first ruling on a dispositive motion for summary judgment and " 'has done everything it plans to do.' " Currie v. Diamond Mortgage Corp., 859 F.2d 1538, 1540 (7th Cir.1988) (citing Bieneman, 838 F.2d at 963). As such, the order is final and this court has jurisdiction under 28 U.S.C. Sec. 1291.[9]
 
 B. The Motion for Summary Judgment
 
 17
 In what is by now a well-established litany, we review de novo a district court's decision to grant a motion for summary judgment and apply the same standard as that employed by the district court. Bank of Waunakee v. Rochester Cheese Sales, Inc., 906 F.2d 1185, 1188 (7th Cir.1990). As such, we will affirm the district court's judgment only if there is no genuine issue of material fact and Equitable is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). After viewing the entire record and the reasonable inferences drawn therefrom in the light most favorable to the plaintiffs, we conclude that the evidence before the district court at the time of the motion for summary judgment was not sufficient to support a jury verdict in plaintiffs' favor, Panozzo v. Rhoads, 905 F.2d 135, 137 (7th Cir.1990), and we affirm.[10]
 
 
 18
 1. Count I--Failure to Comply With Plan Documents
 
 
 19
 The district court's thorough opinion first tackled and rejected plaintiffs' argument that the Balanced Fund, in contravention of Plan documents, was neither balanced nor less risky and volatile. As to plaintiffs' allegations of imbalance, the district court held, and we agree, that the language of the prospectuses and semiannual and annual reports[11] gave Equitable "broad discretion" in deciding the mix of investments in the Balanced Fund. DeBruyne, 720 F.Supp. at 1347. Plaintiffs cannot hold Equitable to a specific portfolio because Equitable never made those promises. Indeed, Equitable made continuous and consistent disclosures that the "balance" in the Balanced Fund could vary substantially. Equitable also made no promises as to the specific type of debt investments that the Balanced Fund would hold, and warned that the "debt securities" portion of the Balanced Fund could include long-term, short-term, and even convertible debt in unspecified quantities. Moreover, when the stock market opened on October 19, the Balanced Fund, true to its billing, had in excess of 30% of its assets invested in "debt securities."
 
 
 20
 Plaintiffs simply fail to counteract this evidence in a manner cognizable under rule 56. They argue that Equitable sometimes categorized convertibles as "equity" investments, an argument that, if successful, would reduce the percentage of "debt securities" held by the Balanced Fund.[12] But that argument glosses over the fact that Equitable clearly defines "debt securities" to include convertible debt.[13] Moreover, as the district court noted, Equitable's lumping of common stock and convertibles for the purpose of some calculations is not unreasonable or ambiguous any more than the nature of the convertible security, with its equity-debt dichotomy, is inherently ambiguous.
 
 
 21
 Plaintiffs also argue that the Balanced Fund was out of balance because, quite simply, Hanan said it was out of balance. But plaintiffs did not invest in Hanan's balanced fund, they invested in Equitable's Balanced Fund, and the Plan gave Equitable freedoms that Hanan simply ignores. Nor did Equitable, on using the term "balanced," become wed to a pre-established definition that could not be chaziged by disclosure. Equitable countered Hanan's ipse dixit claim of imbalance by arguing that the Balanced Fund complied with definitions of "balance" espoused by the SEC, the Wall Street Journal, and three other balanced funds in the industry. If nothing else, these tests illustrate that there is no uniform, pre-established definition of "balance" and that Equitable had substantial freedom in defining that term.
 
 
 22
 As to their assertions that Equitable failed to adhere to Plan directives requiring low risk and volatility, plaintiffs' argument at summary judgment was characterized by a complete lack of proof. Even if one assumes that Plan documents called for Equitable to manage the Plan so as to achieve a specified degree of risk and volatility, liability only attaches to losses "resulting from each such breach." 29 U.S.C. Sec. 1109(a); cf. Brock v. Robbins, 830 F.2d 640, 647 (7th Cir.1987) (requiring connection between breach and loss as prerequisite for damages under 29 U.S.C. Sec. 1104(a)(1)(B)). Plaintiffs, however, failed to produce evidence of risk and volatility in 1987, the time of the loss.[14] And without evidence as to the effect of Equitable's alleged breach, we cannot make the connection between breach and investment loss that is necessary for liability under ERISA. For all we know, Equitable is entirely correct in its assertion that plaintiffs' losses were caused by an unexpected, and uncontrollable, drop in the stock market.
 
 2. Count II--Breach of Fiduciary Duty
 
 23
 As to Count II, which looks at the wisdom of Equitable's investment strategy (regardless of whether it comported with Equitable's disclosures),[15] the district court again found plaintiffs' position deficient. To rebut Equitable's assertion that its investment strategies were prudent, plaintiffs offered as argument only the Hanan affidavit. That document states that the Balanced Fund lost money during the crash and also states that the Balanced Fund was not prudently managed because it was not balanced in accordance with what a "typical" balanced fund portfolio manager might have done in 1987.
 
 
 24
 As the district court correctly noted, the ultimate outcome of an investment is not proof of imprudence. Marshall v. Glass/Metal Ass'n & Glaziers & Glassworkers Pension Plan, 507 F.Supp. 378, 384 (D.Haw.1980). We cannot say that Equitable was imprudent merely because the Balanced Fund lost money; such a pronouncement would convert the Balanced Fund into an account with a guaranteed return and would immunize plaintiffs from assuming any of the risk of loss associated with their investment. "The fiduciary duty of care," as the district court so cogently stated it, "requires prudence, not prescience." DeBruyne, 720 F.Supp. at 1349.
 
 
 25
 Hanan's assertions of what a "typical" balanced fund portfolio manager might have done in 1987 say little about the wisdom of Equitable's investments, only that Equitable may not have followed the crowd. Moreover, Hanan's assertions are undercut by evidence that the Balanced Fund was in line with five relevant tests. Even if this evidentiary matter is sufficient to raise a genuine issue of material fact as to the prudence of Equitable's course of conduct, plaintiffs still failed to produce evidence of risk and volatility in 1987. And that failure again leaves us without a basis for concluding that the alleged breach of fiduciary duty caused plaintiffs' loss. See 29 U.S.C. Sec. 1109(a); Brock, 830 F.2d at 647.[16]
 
 
 26
 3. Counts III, IV, and V--Material Misrepresentations
 
 
 27
 As to Counts III, IV, and V, the district court held that Equitable's disclosures, taken as a whole, were sufficiently cautionary that Equitable had not made material misrepresentations. Such a conclusion, as we have already discussed, was correct with respect to Equitable's representations concerning balance. Plaintiffs' allegations as to the Balanced Fund's risk and volatility, on the other hand, appear more likely to raise a genuine issue of fact as to misrepresentation. We need not reach the material misrepresentation issue, however, because plaintiffs' securities law claims suffer from more fundamental flaws.
 
 
 28
 If the sole concern of the securities law was the prevention of fraud, "we might always allow securities suits no matter when they are filed." See Goldstandt v. Bear, Stearns & Co., 522 F.2d 1265, 1269 (7th Cir.1975). But fairness requires a cut-off point, and section 13 of the '33 Act requires plaintiffs to bring claims under sections 11 and 12(2) within "one year after the discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. Sec. 77m. This period does not commence only when a plaintiff has full knowledge of the existence of a claim. On the contrary, the one-year limitations period begins to run even when a plaintiff is placed on "inquiry notice" of possible misrepresentations. Astor Chauffeured Limousine Co. v. Runnfeldt Investment Corp., 910 F.2d 1540, 1544 (7th Cir.1990); Cook v. Avien, Inc., 573 F.2d 685, 697-98 (1st Cir.1978).
 
 
 29
 While the objective "reasonable diligence" standard does not lend itself easily to summary judgment, neither is such a motion always doomed to failure. See Kramas v. Security Gas & Oil Inc., 672 F.2d 766, 770-71 (9th Cir.), cert. denied, 459 U.S. 1035, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982); see also Brock v. TIC Int'l Corp., 785 F.2d 168 (7th Cir.1986). Here, plaintiffs admit that they "suspected that the Balanced Fund was unbalanced in mid-October, 1987,"[17] more than a year before they filed suit. In their reply brief, plaintiffs admit that DeBruyne received a document in mid-November 1987 that made him "suspicious."[18] And if those statements alone are insufficient, Equitable's consistent and continuous precrash disclosure also clearly gave rise to a duty of inquiry on the part of the plaintiffs. Once that inquiry notice arose, the one-year statute of limitations "did not await appellant[s'] leisurely discovery of the full details of the alleged scheme." Klein v. Bower, 421 F.2d 338, 343 (2d Cir.1970).
 
 
 30
 In their argument before this court, plaintiffs implicate not one document, but a series of documents from 1985 to 1987. They assert that, in light of the evidence in Hanan's affidavit, Equitable's disclosures over a three-year period on balance, risk, and volatility were all false when made. But these allegations of pervasive misrepresentation are inconsistent with plaintiffs' argument that they were not on notice until March 24, 1988, when Equitable sent them a letter disclosing the Balanced Fund's October 19, 1987, asset mix.
 
 
 31
 The problem with plaintiffs' argument is that there was nothing unusual about the March 24 disclosure other than the fact that it represented the Balanced Fund's asset mix on the date of the market crash. Equitable had never hesitated to disclose the asset mixes of the Balanced Fund. Indeed, plaintiffs readily admit that Equitable, during the entire 1985-87 period, was disclosing the asset mixes of the Balanced Fund and was also telling investors that the percentage of equities (including convertibles) in the Balanced Fund ranged between 43% and 94%. Yet for some reason plaintiffs insist that the calculations of the Balanced Fund's October 19 asset mix were somehow distinct. They argue that they could not have known about those calculations, and therefore the alleged misrepresentations, prior to the March 24, 1988, letter.[19]
 
 
 32
 Plaintiffs' argument is puzzling. While the October 19 asset mix may have had some relevance to the alleged loss, it has no special relevance to the alleged misrepresentations.[20] Plaintiffs allege a three-year course of pervasive misrepresentation but they selectively ignore Equitable's continued and open disclosures as to the percentage composition of the Balanced Fund. They now complain that the Balanced Fund was imbalanced, and therefore more risky and volatile, because it did not have a sufficient investment in long-term bonds. They stated in deposition that they invested in the Balanced Fund because they thought that it would hold no less than 20% and as high as 50% of its assets in nonconvertible debt. But if that is the case, then basic logic leads us to the conclusion that an investor reading with reasonable care would have been suspicious, if not enraged, when Equitable openly stated prior to November 30, 1987, that the Balanced Fund was made up of only .3% nonconvertible debt on September 30, 1987; 4% nonconvertible debt on June 30, 1987; 2.3% nonconvertible debt on March 31, 1987; and 6.78% nonconvertible debt on September 30, 1986.[21]
 
 
 33
 Plaintiffs' present interpretations of Equitable's disclosures were constantly contradicted by a stream of documents relating to the Balanced Fund. Even without plaintiffs' admissions, that constant contradiction is sufficient to allow us to conclude, for summary judgment purposes, that plaintiffs were on inquiry notice at least one year prior to the time in which they filed their complaint. Cf. Astor Chauffeured Limousine, 910 F.2d at 1544; see also Jensen v. Snellings, 841 F.2d 600, 607 (5th Cir.1988) (plaintiff placed on "inquiry notice" when there are "storm warnings" that would alert "a reasonable investigator to the possibility of fraudulent statements or omissions in his securities transaction"). As such, their '33 Act claims are time barred.
 
 
 34
 With respect to plaintiffs' other securities law claims, this court has recently held that the one-year statute of limitations period in section 13 of the '33 Act applies to claims under section 10(b) of the '34 Act and SEC rule 10b-5. Short v. Belleville Shoe Mfg. Co., 908 F.2d 1385, 1387-93 (7th Cir.1990), petition for cert. filed, No. 90-526 (Sept. 26, 1990). We need not delve into the issue of plaintiffs' reliance interest in the formerly embraced period of limitations, however, because plaintiffs failed to produce evidence to establish another element of their claim--causation. Liability under section 10(b) and rule 10b-5, just as liability under ERISA, requires some demonstration of causation. Bastian v. Petren Resources Corp., 892 F.2d 680, 683-86 (7th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990); see also Securities Investor Protection Corp. v. Vigman, 908 F.2d 1461, 1467-68 (9th Cir.1990). Plaintiffs, however, made no showing that the Balanced Fund was risky and volatile in October 1987, and without that showing we cannot conclude that plaintiffs' loss was caused by the risk and volatility of the Balanced Fund as opposed to sheer market forces beyond Equitable's control.
 
 4. Count VI--New York Insurance Law
 
 35
 Count VI, the last of plaintiffs' claims, is based on section 4226 of the New York Insurance Law. That statute provides:
 
 
 36
 No insurer authorized to do in this state the business of life, or accident and health insurance, or to make annuity contracts shall:
 
 
 37
 (1) issue or circulate, or cause to permit to be issued or circulated on its behalf, any illustration, circular, statement or memorandum misrepresenting the terms, benefits or advantages of any of its policies or contracts....
 
 
 38
 N.Y.INS.LAW Sec. 4226(a). The statute also provides that those purchasing such policies or contracts may recover their premiums as well as any other compensation paid to the insurer. Id. Sec. 4226(d).[22]
 
 
 39
 The district court, in dismissing the claim, seized upon the fact that section 4226(a)(1) requires a misrepresentation. As with the plaintiffs' securities law claims, we need not reach that issue. This particular application of section 4226(a)(1) has been preempted by ERISA.[23]
 
 
 40
 Congress, when passing ERISA, envisioned that it would "reserv[e] to Federal authority the sole power to regulate the field of employee benefit plans." Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 46, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987) (citing 120 Cong.Rec. 29, 197 (1974)). In order to assist that massive undertaking, Congress specified that ERISA would supersede "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. Sec. 1144(a). The only exception to that broad preemptive scope is for those laws that regulate insurance, banking, or securities. Id. Sec. 1144(b)(2)(A) (savings clause).[24]
 
 
 41
 Thus, our analysis centers around two basic questions. First, does section 4226(a)(1) "relate to" employee benefit plans? Second, if section 4226(a)(1) does relate to employee benefit plans, is it saved by the fact that it regulates insurance?
 
 
 42
 As to the first question, the answer is clearly yes. As the Supreme Court has acknowledged, the expansive preemption provisions of ERISA are designed to "establish pension plan regulation as exclusively a federal concern." Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981). Thus, "[t]he phrase 'relate to' [is] given its broad common-sense meaning, such that a state law 'relate[s] to' a benefit plan 'in the normal sense of the phrase, if it has a connection with or reference to such a plan.' " Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 739, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728 (1985) (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983)). Here, plaintiffs use section 4226(a)(1) to challenge representations made in Plan documents, and it "cannot be gainsaid" that such an application relates to the Plan. See Perkins v. Time Ins. Co., 898 F.2d 470, 473 (5th Cir.1990).
 
 
 43
 As to the second question, the answer is clearly no. The Supreme Court in Pilot Life set out two tests for determining whether a state law falls under ERISA's savings clause because it regulates "insurance." The first test is a " 'common-sense view.' " Pilot Life, 481 U.S. at 48, 107 S.Ct. at 1553 (quoting Metropolitan Life, 471 U.S. at 740, 105 S.Ct. at 2389). The second test, which mimics the "business of insurance" test under the McCarran-Ferguson Act, 15 U.S.C. Secs. 1011-1015, is a three-factor analysis:1. " '[W]hether the practice has the effect of transferring or spreading a policyholder's risk' ";
 
 
 44
 2. " '[W]hether the practice is an integral part of the policy relationship between the insurer and the insured' "; and
 
 
 45
 3. " '[W]hether the practice is limited to entities within the insurance industry.' "
 
 
 46
 Pilot Life, 481 U.S. at 48-49, 107 S.Ct. at 1553 (quoting Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 129, 102 S.Ct. 3002, 3009, 73 L.Ed.2d 647 (1982)). In addition to the two "insurance" tests, the Court used the language, structure, and legislative history of ERISA as an additional basis for preempting state law. Id. 481 U.S. at 51-57, 107 S.Ct. at 1554-58.
 
 
 47
 Assuming that a common sense view of section 4226(a)(1) leads to the conclusion that it regulates insurance, the statute still fails the more rigorous McCarran-Ferguson test. Under that test, it is not enough that a statute has some specific direction toward the insurance industry. The McCarran-Ferguson analysis looks at whether a statute regulates the "business of insurance," not whether the statute regulates the "business of insurance companies." See SEC v. National Sec., Inc., 393 U.S. 453, 459, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969).
 
 
 48
 And with that distinction in mind, we turn to the first factor in the McCarran-Ferguson test. As the Supreme Court noted in Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 211, 99 S.Ct. 1067, 1073, 59 L.Ed.2d 261 (1979), the primary features of an insurance contract are the spreading and underwriting of the policyholder's risk. Here, however, section 4226(a)(1) does not pool and average policyholders' risks. Compare Metropolitan Life, 471 U.S. at 743, 105 S.Ct. at 2391 (mandated-benefit statutes "intended to effectuate the legislative judgment that the risk of mental-health care should be shared"); see generally R. KEETON, INSURANCE LAW Sec. 1.2(b), at 3-9 (1971). Instead, the statute "forces the insurer to bear the legal risks associated with [fraudulent] policy language." See McMahan v. New Eng. Mut. Life Ins. Co., 888 F.2d 426, 429 (6th Cir.1989). As such, the statute fails the first prong of McCarran-Ferguson test.
 
 
 49
 Section 4226(a)(1) also fails the third prong of the McCarran-Ferguson test.[25] Even if associated with the insurance industry by virtue of its placement in New York's insurance code, section 4226(a)(1) merely codifies general principles of common law fraud in an attempt to limit unfair trade practices. See 68 N.Y.JUR.2D Insurance Sec. 40 (1963); see generally 43 AM.JUR.2D Insurance Sec. 35 (1982). Indeed, the main difference (for our purposes) between common law fraud and section 4226(a)(1) is that New York has tacked the word "insurance" onto the latter. See generally W. KEETON, D. DOBBS, R. KEETON & D. OWEN, PROSSER AND KEETON ON TORTS Secs. 105-110 (5th ed. 1984 & Supp.1988). And under those circumstances, the conclusion that common law fraud does not regulate insurance, see Pilot Life, 481 U.S. at 51, 107 S.Ct. at 1554 (preempting cause of action under Mississippi common law of general application), would be difficult, if not impossible, to reconcile with the conclusion that section 4226(a)(1) does regulate insurance.
 
 
 50
 The language, structure, and legislative history of ERISA only bolster the conclusion that section 4226(a)(1) does not regulate "insurance." See Pilot Life, 481 U.S. at 51, 107 S.Ct. at 1554. Specifically, the New York insurance statute interferes with ERISA's civil enforcement scheme in that it enlarges the scope of remedies otherwise available. In its preemption analysis in Pilot Life, the Supreme Court paid special attention to the fact that the state law in question provided for punitive damages, a remedy not found in section 502(a) of ERISA, 29 U.S.C. Sec. 1132(a). After a thorough analysis of ERISA's civil enforcement provision, the Court concluded that ERISA's civil enforcement remedies "were intended to be exclusive." Pilot Life, 481 U.S. at 54, 107 S.Ct. at 1556 ("The policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA.").
 
 
 51
 Here, section 4226(d) provides for a rescission-type remedy that is not available under ERISA. Compare 29 U.S.C. Secs. 1109(a) (providing damages only for losses incurred as a result of breach of fiduciary duty), 1132(a)(2) with N.Y.INS.LAW Sec. 4226(d). And the New York statute's incompatibility with and potentially undermining effect on ERISA are quite apparent in this case. For section 4226(d) does not by its terms require plaintiffs to prove that they suffered a loss and that their loss was caused by the alleged violation. N.Y.INS.LAW Sec. 4226(d). ERISA, on the other hand, requires both. 29 U.S.C. Sec. 1109(a). Thus, section 4226(a)(1) might allow plaintiffs a damages remedy even though their failure of proof, detailed supra, precluded damages under ERISA. Section 4226(d) blatantly conflicts with the exclusive nature of ERISA's civil enforcement scheme, and is therefore preempted.
 
 
 52
 Section 4226(a)(1) also interferes with ERISA's carefully crafted fiduciary liability provision. Plaintiffs hope to use the New York statute as a basis for a class action seeking redress for alleged misrepresentations contained in Plan documents. Yet ERISA already contains a comprehensive fiduciary duty section that requires fiduciaries to manage plans in accordance with plan documents, see 29 U.S.C. Sec. 1104(a)(1)(B), and plaintiffs allege a violation of that statute in the first count of their complaint. As used by plaintiffs, the state law claim and the ERISA fiduciary duty claim are virtually the same: alleging that a fiduciary included fraudulent representations in plan documents is the same as alleging that a fiduciary failed to manage a plan in accordance with those same representations. And whatever the exact parameters of the savings clause, it cannot be read to save an application of a state statute that mimics ERISA's fiduciary liability provision.[26] See Shaw, 463 U.S. at 98, 103 S.Ct. at 2900; Perry v. P*I*E Nationwide Inc., 872 F.2d 157, 161 (6th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1166, 107 L.Ed.2d 1068 (1990).
 
 
 53
 In summary, an analysis of section 4226(a)(1) indicates that the statute does not regulate "insurance" as that term is defined under the McCarran-Ferguson test. The language, structure, and legislative history of ERISA only confirm that conclusion. As such, the specific application of section 4226(a)(1) advocated by plaintiffs is preempted.[27]
 
 C. The Motion for Reconsideration
 
 54
 We review denials of motions for reconsideration under an abuse of discretion standard. See Estate of Kraus v. Commissioner, 875 F.2d 597, 602 (7th Cir.1989). In order to find such an abuse of discretion, we must conclude that "no reasonable man could agree with the district court." Metlyn Realty Corp. v. Esmark, Inc., 763 F.2d 826, 831 (7th Cir.1985); see also Mumford v. Bowen, 814 F.2d 328, 329 (7th Cir.1986). Here, we conclude that plaintiffs fail to meet their burden under that deferential standard.
 
 
 55
 In their reply memorandum in support of their motion for reconsideration, plaintiffs attached a supplemental affidavit by their expert, Hanan. This affidavit criticized calculations that Equitable introduced in its answer to the motion for reconsideration. Using Equitable's answer for discovery, it also introduced "new" evidence in the form of risk and volatility calculations for the 1985-87 period.
 
 
 56
 These calculations are the only portion of plaintiffs' motion that merit discussion. But while potentially relevant if viewed in the light most favorable to plaintiffs, Hanan's calculations were too little, too late. First, Hanan's supplemental affidavit was not notarized at the time of filing. Moreover, the supplemental affidavit was unable to invoke 28 U.S.C. Sec. 1746 (permits unsworn declarations if made "under penalty of perjury" and verified as "true and correct"). As such, the "affidavit," which did not subject Hanan to the penalties for perjury, was not within the range of evidence that the district court could consider. See Pfeil v. Rogers, 757 F.2d 850, 859 (7th Cir.1985) (unsworn statement does not meet requirements of FED.R.CIV.P. 56(e)) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 n. 19, 90 S.Ct. 1598, 1609 n. 19, 26 L.Ed.2d 142 (1970)), cert. denied, 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986). At best, this flaw was simply one more deficiency in a growing list.[28]
 
 
 57
 Second, the proper time to introduce Hanan's supplemental calculations was in response to Equitable's motion for summary judgment, not in a motion to reconsider (much less a reply memorandum to a motion to reconsider). Manor Healthcare Corp. v. Guzzo, 894 F.2d 919, 922 n. 4 (7th Cir.1990) (" '[M]otions for reconsideration cannot ... be employed as a vehicle to introduce new evidence that could have been adduced during the summary judgment motion.' ") (quoting Publishers Resource, Inc. v. Walker-Davis Publications, Inc., 762 F.2d 557, 561 (7th Cir.1985)); cf. FTC v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1025-26 (7th Cir.1988). Plaintiffs do not, and on this record apparently cannot, give an explanation as to why the financial information necessary for Hanan's calculations would have alluded timely discovery. With that failure before it, the district court was not obliged to rescue plaintiffs from the consequences of their dilatory conduct, and neither are we. See Rothwell Cotton Co. v. Rosenthal & Co., 827 F.2d 246, 251 (motion to reconsider should be denied when movant, "through the exercise of due diligence, [could] have presented the 'newly discovered evidence' to the district court before" granting of summary judgment), amended on other grounds, 835 F.2d 710 (7th Cir.1987).
 
 III.
 
 58
 The plaintiffs, unwilling to believe that their venture into the market could produce such an unfavorable result, sought to charge at least a portion of their losses to their investment manager, Equitable. But in order to survive a valid motion for summary judgment, the plaintiffs must be able to present colorable evidence to support the elements of cognizable claims. Without such a showing, the district court could grant summary judgment in favor of defendants. Furthermore, because the only potentially meritorious assertion in plaintiffs' motion to reconsider was neither formatted properly nor introduced at the proper time, the district court was well within its discretion in denying that motion. The judgment of the district court is
 
 
 59
 AFFIRMED.
 
 
 
 [1]
 This designation is for convenience only
 
 
 [2]
 This disclosure was continuous and consistent. For example, the May 1985 prospectus stated that Equitable would "vary the portion of the Balanced Fund's assets invested in each type of security in accordance with economic conditions, the general level of common stock prices, interest rates and other relevant considerations" with the "mix [to be] determined by [the] portfolio manager." Equitable noted that "since its inception, the percentage of the Balanced Fund's assets invested in equities (including convertibles) has averaged around 80%." The 1985 prospectus also disclosed that Equitable could invest the Balanced Fund's assets in long-term or short-term debt and that "the average maturity of the debt securities held by the Balanced Fund will vary according to market conditions and the stage of interest rate cycles." The May 1986 and May 1987 prospectuses duplicated many of the earlier statements and also disclosed that "since its inception, the percentage of the Balanced Fund's assets invested in equity securities (including convertibles) ranged from 43% to 94%."
 Moreover, Equitable's various reports and updates continually disclosed the specific asset mix of the Balanced Fund. Equitable's October 1986 "Insider's Update" stated that the September 30, 1986, asset mix was as follows: 57.44% in stocks; 12.36% in convertible bonds; 6.78% in nonconvertible debt; and 23.42% in cash and short-term debt. The April 1987 Insider's Update stated that the March 31, 1987, asset mix was as follows: 62% in stocks; 14.9% in convertible bonds; 2.3% in nonconvertible debt; and 20.8% in cash and short-term debt. The July 1987 Insider's Update disclosed that the June 30, 1987, investment composition of the Balanced Fund was as follows: 69.5% in stocks; 15.1% in convertible bonds; 4% in nonconvertible debt; and 11.4% in cash and short-term debt. Last, plaintiffs admit that they received an Insider's Update in mid-November 1987 which stated that the September 30, 1987, asset mix was as follows: 69.7% in common stocks; 16% in convertible debt; . 3% in nonconvertible debt; and 14% in cash and short-term debt.
 
 
 [3]
 These three factors, though treated separately at times by the parties, are closely related. Plaintiffs do not challenge the asset mix of the Balanced Fund for the reason that it is not aesthetically pleasing, they challenge the asset mix because it allegedly made the Balanced Fund more risky and volatile. Moreover, Hanan's affidavit blurs the distinction between risk and volatility when it states that volatility is "the most important measure of a mutual fund's risk."
 
 
 [4]
 Specifically, counsel for plaintiffs made the following statement before the district court on June 8, 1989: "The last motion was deficient. There is no question about that."
 
 
 [5]
 Rule 56(f) of the Federal Rules of Civil Procedure states:
 Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.
 FED.R.CIV.P. 56(f) (emphasis added); see also Lamb's Patio Theatre, Inc. v. Universal Film Exchanges, Inc., 582 F.2d 1068, 1070-71 (7th Cir.1978).
 
 
 [6]
 Plaintiffs' counsel later produced an explanation for this failure to appear, but not until after Equitable reminded the district court of the "no-show."
 
 
 [7]
 Hanan's affidavit states that "[t]here are essentially two measures of investment risk, volatility and beta." Hanan then says that volatility, "the most important measure of a mutual fund's risk," is measured by using standard deviation calculations
 
 
 [8]
 FED.R.CIV.P. 23(c)(1). We have noted in prior cases that this duty applies even if the parties do not ask. Bieneman v. City of Chicago, 838 F.2d 962, 963-64 (7th Cir.1988)
 
 
 [9]
 Because no class of plaintiffs was certified, only the named plaintiffs are before this court. Therefore, "we treat plaintiffs' claims as being brought solely by the named plaintiffs against the named defendants." Rutan v. Republican Party, 868 F.2d 943, 946-47 (7th Cir.1989), aff'd in part and reversed in part on other grounds, --- U.S. ----, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)
 
 
 [10]
 To the extent that we do not specifically follow the reasoning of the district court, we note that an appellate court may affirm on any ground that finds support in the record. Dairyland Financial Corp. v. Federal Intermediate Credit Bank, 852 F.2d 242, 244 (7th Cir.1988)
 
 
 [11]
 The district court did not reach the issue of whether Equitable's reports and prospectuses constituted "plan documents" under ERISA. In light of our holding, we, too, can avoid that determination
 
 
 [12]
 See supra note 2, detailing instances in which Equitable treated convertibles as equity securities
 
 
 [13]
 Plaintiffs' argument also assumes that the recalculated percentage would show a violation of Plan documents, but Equitable's broad discretion makes even that assumption questionable
 
 
 [14]
 Plaintiffs' argument against this conclusion relies solely on Hanan's comparison of the Balanced Fund's 1987 losses to the performance of other balanced funds. This comparison, though, illustrates merely that the Balanced Fund's percentage losses were high in comparison to other funds. Hanan fails to explain why investment loss has a correlation to risk and volatility. Moreover, he undermines the plaintiffs' argument by his strong and sole emphasis on other calculations--beta and standard deviation--as the true indicators of risk and volatility
 
 
 [15]
 See Central States S.E. & S.W. Areas Pension Fund v. Central Transport, Inc., 472 U.S. 559, 568, 105 S.Ct. 2833, 2839, 86 L.Ed.2d 447 (1985) ("trust documents cannot excuse trustees from their duties under ERISA")
 
 
 [16]
 On appeal, plaintiffs recharacterize their argument to focus on Equitable's purchase of convertibles and failure to purchase government bonds. This course of conduct, they assert, breached Equitable's fiduciary duty of care because, according to Hanan's affidavit, convertibles could not act as a hedge against the rising volatility of the stock market. But, at most, Hanan only suggests that convertibles may be "vulnerable to market swings"--a rather unobtrusive conclusion in light of the equity conversion privilege attached to convertible debt. Moreover, the failure to present evidence of causation ultimately moots this argument as well
 
 
 [17]
 Plaintiffs' Memorandum in Opposition to Motion for Summary Judgment at 67, DeBruyne, 720 F.Supp. 1342 (No. 88 C 10098)
 
 
 [18]
 Plaintiffs attempt to diminish the relevance of this last admission by arguing that DeBruyne did not read the document until December 1987. Inquiry notice, however, does not arise at the whim of the plaintiff. The relevant date is mid-November 1987, not December 1987; plaintiffs cannot avoid the statute of limitations by possessing, but failing to read, the documents that would put them on inquiry notice
 
 
 [19]
 Plaintiffs have also suggested that they have complied with the statute of limitations because at least a portion of their knowledge regarding the alleged misrepresentations did not arise until after they filed the complaint and hired their expert, Hanan. It is an intellectually bankrupt argument, however, or a violation of rule 11, for a plaintiff to file a complaint alleging misrepresentation and, in the same breath, to assert that he or she did not discover the misrepresentation until after the filing of the complaint
 
 
 [20]
 The October 19 asset mix may have also had some special relevance if plaintiffs had asserted that the Balanced Fund was only out of balance on October 19. That argument, however, clearly is not the one that plaintiffs have pressed before this court
 
 
 [21]
 See supra note 2
 
 
 [22]
 Section 4226(d) states: "Any such insurer that knowingly violates any provision of this section, or knowingly receives any premium or other compensation in consequence of such violation shall, in addition to any other penalty provided in this chapter, be liable to a penalty in the amount of such premium or compensation, which penalty may be sued for and recovered by any person aggrieved for his own use and benefit...." N.Y.INS.LAW Sec. 4226(d)
 
 
 [23]
 Under United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), a district court should normally relinquish pendent jurisdiction when all federal claims fall out before trial. The Gibbs doctrine is not without its exceptions, however, one of which arises when a defendant argues that the pendent claim has been preempted by federal law. See Graf v. Elgin, J. & E. Ry., 790 F.2d 1341, 1347 (7th Cir.1986) (when court "can tell at a glance that the defendant has a complete and meritorious federal defense, the court has and can exercise the power to retain pendent jurisdiction, adjudicate the defense, and dismiss the case"). And because the district court could have dismissed Count VI on preemption grounds (defendants raised that ground in their motion for summary judgment), and would have properly retained jurisdiction thereby, this court can affirm the judgment of the district court on that same federal law defense
 
 
 [24]
 The so-called "deemer" clause, 29 U.S.C. Sec. 1144(b)(2)(B), creates an exception to this exception, but does not appear to be applicable in this case
 
 
 [25]
 We do not address the second element of the McCarran-Ferguson test at this time
 
 
 [26]
 A contrary holding would allow those suing New York insurance companies to take "two bites at the apple" while limiting some other plaintiffs to only one. Compare N.Y.INS.LAW Secs. 4226(a)(1), (d) (providing for private cause of action) with, e.g., ALA.CODE Sec. 27-12-6 ("twisting" statute that does not allow private cause of action)
 
 
 [27]
 Our holding is limited to the specific application of section 4226(a)(1) advocated by plaintiffs and we take no position on other applications of 4226(a)(1). Moreover, while cognizant of a dispute among the courts as to whether ERISA generally preempts similar statutes, see, e.g., HealthAmerica v. Menton, 551 So.2d 235 (Ala.1989) (collecting cases); cert. denied, --- U.S. ----, 110 S.Ct. 1166, 107 L.Ed.2d 1069 (1990), we have no intention of weighing into that debate at this time. This case, we believe, is clearly distinguishable from those cases because the alleged misrepresentations in this case derive from Plan documents and because ERISA specifically provides an identical cause of action sufficient to address those misrepresentations
 
 
 [28]
 Equitable's answer brief informs us that plaintiffs eventually mailed a notarized signature page to the district court on November 7, 1989--one week after the district court denied the motion for reconsideration