James BIONDO, Plaintiff,

v.

**LIFE INSURANCE COMPANY OF NORTH AMERICA, a subsidiary of Cigna Corporation, Defendant.**

**No. 99–CV–74676–DT.**

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 29, 2000.

Joseph T. Long, Grosse Pointe, MI, for plaintiff.

Terry J. Pawlowski, Troy, MI, for defendant.

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION TO REMAND AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

The above-captioned denial-of-benefits action is presently before the Court on two motions—Plaintiff's Motion to Remand Case Back to State Court and Defendant's Motion for Summary Judgment.[1] Opposition and reply briefs have been filed by the respective parties. Having reviewed and considered the parties briefs and supporting documents, the Court has determined that oral argument is not necessary. Therefore, pursuant to Eastern District of Michigan Local Rule 7.1(e)(2), these Motions will be decided "on the briefs." This Opinion and Order sets forth the Court's ruling.

---

1. Although filed as a "Motion for Summary Judgment," the Sixth Circuit has held that summary judgment procedures may no longer be used in this Circuit in ERISA actions to recover benefits. *See Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir.1998), holding that summary judgment procedures may no longer be used in this Circuit in ERISA actions to recover benefits. In *Wilkins*, the court determined that district courts should not adjudicate ERISA actions as if it were conducting a standard bench trial and, therefore, determining whether there is a genuine issue of fact for trial would make little sense. 150 F.3d at 618–19. Accordingly, the court established a set of guidelines to replace summary judgment procedures for district courts to use in adjudicating ERISA recovery of benefits actions.

As to the merits of the claim, the *Wilkins* court instructed district courts to conduct a *"de novo"* or "arbitrary and capricious" review based solely upon the administrative record and render "findings of fact" and "conclusions of law" accordingly. *Id.* at 619.

*See also, Marchetti v. Sun Life Assurance Co.*, 30 F.Supp.2d 1001 (M.D.Tenn.1998). In so doing, the court may consider the parties' arguments concerning the proper analysis of the evidence contained in the administrative record. *Wilkins, supra; Marchetti, supra.* However, it may not admit or consider any evidence not presented to the administrator except where there is a procedural challenge to the administrator's decision, such as lack of due process afforded by the administrator or alleged bias on its part. *Id.* (Pre-hearing discovery should also be limited to such procedural challenges. *Id.*)

Therefore, the Court will treat Defendant LINA's Motion for Summary Judgment as a motion for entry of judgment upholding the plan administrator's decision and, there being no due process or bias challenge to the administrator's decision, will decide this matter pursuant to the guidelines set forth in *Wilkins* by rendering findings of fact and conclusions of law based solely upon the administrative record.

## II. PERTINENT FACTS

Plaintiff James Biondo is an general maintenance employee of University Liggett School ("Liggett") and a participant in Liggett's employee benefit plan which includes, in pertinent part, accidental dismemberment benefits covered by a group insurance policy issued by Defendant Life Insurance Company of North America ("LINA"). On April 16, 1997, Plaintiff filed a claim for accidental loss of sight benefits under the LINA group policy. [See Defendant's Summary Judgment Ex. B.] Plaintiff claimed that he suffered a retinal detachment in his right eye as the result of lifting boxes at work on September 5, 1996. Id. There was no other injury or trauma associated with Plaintiff's September 5, 1996 activities.

Mr. Biondo underwent scleral buckle surgery to repair the retinal detachment on September 6, 1996. The doctor who performed the surgery, vitreo-retinal specialist Dr. Brian Joondeph, M.D., noted prior to performing the surgery that Mr. Biondo had "Grade C2–PVR" in addition to a detached retina.. [2] [See Dr. Joondeph's records attached at Defendant's Ex. E.] Dr. Joondeph stated in a letter dated September 10, 1996 to Dr. Gerald Mullan, Plaintiff's general opthalmologist, that due to the PVR, the prognosis was guarded. Id. Dr. Joondeph discussed his findings with Mr. Biondo and pointed out to him the risks of surgery, including the risk of progression of his PVR, and how it could lead to the need for additional surgery, including vitrectomy. Id. Mr. Biondo, nonetheless agreed to the surgery with the understanding that if his PVR progresses, the visual prognosis would be guarded. Id.

When Plaintiff presented himself to Dr. Joondeph for a post-operative examination on September 11, Dr. Joondeph observed that Mr. Biondo's retina had redetached. He stated in a September 12 letter to Dr. Mullan that this redetachment was due to PVR, reminding Dr. Mullan that Mr. Biondo had PVR present prior to his first operation. Id. As Dr. Joondeph opined, other than leaving the eye alone, the only option was further surgery. Id. Therefore, on September 20th, he performed vitrectomy surgery on Plaintiff's eye to reattach the retina. Following this second September 1996 surgery, Plaintiff was cleared to return to light duty work.

However, on October 9, 1996, Mr. Biondo's retina became detached again. He underwent additional vitrectomy surgery to his right eye for complicated retinal detachment on October 11, 1996. Plaintiff's retina was completely attached and the eye was otherwise healing nicely. This last surgery, although successful in that Plaintiff's retina remained attached, ultimately proved to be unsuccessful as Plaintiff lost essentially all vision in his right eye. Other than his monocular vision, Plaintiff has no physical limitations. He was, however, instructed to wear safety glasses at all times while at work to give an added measure of protection to his only seeing left eye.

Plaintiff's September 1996 retinal detachment was not the first problem Plaintiff had with his right eye. The records of Dr. Joondeph, in fact, establish that Plaintiff has had "a complicated ocular history." He had a traumatic cataract in his right eye and underwent cataract extraction in the 1980s. This was followed by YAG laser capsulotomy and muscle surgery. Then in July 1996, five weeks prior to the September 5 retinal detachment, Plaintiff had a secondary lens implant in that same eye. [See Dr. Joondeph's records at Defendant's Ex. E.] Records of Plaintiff's employer reveal that upon being cleared to return to work after the July 1996 lens implant surgery, Plaintiff was directed to avoid heavy lifting. [See John Hearn

2. "PVR," or proliferative vitreoretinopathy, is a disease in which scar tissue grows on the surface of the retina which can cause the retina to detach. See website on the Internet maintained by the Retina Research Fund, "Retinal Detachment and Vitreous Surgery,"© 1991.

9/10/96 Memo to David Boring, included within the records in Defendant's Ex. E.] Plaintiff's supervisor told him to distribute whatever packages he could—to use his judgment—and that he would arrange to have the heavier boxes handled by someone else. *Id.*

On April 16, 1997, Plaintiff filed a claim for accidental dismemberment "loss of sight" benefits with LINA pursuant to Liggett's Group Insurance Plan. On October 6, 1997, based on the medical records submitted by Plaintiff as well as an independent medical review of those records done by Dr. James L. Adams, M.D., an opthalmologist in Ypsilanti, Michigan, Plaintiff's claim for benefits was denied.

In her letter explaining the denial of Plaintiff's claim LINA/CIGNA Product Specialist Eleanor Mendicino stated:

Payment of proceeds are subject to various provisions described under the policy.... The provisions specific to your claim are quoted below:

The Insurance company will pay benefits for any of the losses listed below if an Employee is insured under the Policy for Accident Insurance on the date of an Accident. The loss must:

1. Be a result of bodily injuries caused directly, **and from no other causes,** by an Accident; and

2. Occur within 365 days of the Accident.

\* \* \* \* \* \*

"The Insurance Company will not pay Accident Insurance Benefits for a loss which in any way results from ... sickness, disease or bodily infirmity; medical or surgical treatment; or bacterial or viral infection, no matter how contracted. (This does not include bacterial infection that is the natural and foreseeable result of an accidental bodily injury or accidental food poisoning.)"

The following documents were submitted by the claimant for our review:

- Employers Basic Report of Injury
- Narrative note as told on 9/10/96

- Memos from Jan Manney dated 9/13/96 and 10/9/96
- Letters pertaining to Workers Compensation
- Physicians Certificate of Dr. Gerald Mullan and Dr. Brian Joondeph
- Letters from Dr., Joondeph dated 9/27/96 and 10/19/96

In addition to these documents, we have reviewed the following documentation in making our determination:

- Group/Association—Proof of Loss claim form
- Physician's Certificate completed by Julian J. Nussbaum, M.D.
- Group Policy # FLI 0050081 with University Liggett School
- Medical Records received from Julian J. Nussbaum, M.D.
- Medical Records received from Brian C. Joohdeph, M.D.
- Case file information received from Karen McCoy, Citizens Insurance
- Independent Record Review obtained through UNIVAL

The independent review revealed that you had a history of traumatic cataract in the early 80s, followed by Yag laser capsulotomy, eye muscle surgery, and secondary intraocular lens implant. This history reveals an increased risk for a retinal detachment....

Although the independent medical review contained an opinion that a retinal detachment could have occurred just as easily if you had been sitting at home in your chair rather than occurring as a result of the lifting of books, the narrative and reported accounts of the lifting of books followed closely by loss of vision does support your claim that your retinal detachment and subsequent loss of vision was caused by lifting heavy objects.

However, the independent medical review also concluded that traumatic cataract, YAG laser capsulotomy, secondary intraocular lens implant occurring prior to retinal detachment all statistically in-

crease the risk of retinal detachment. The review further concluded that these prior events would be expected to be a significant factor contributing to the retinal detachment and current loss of vision.

In addition to the expert opinion that your prior health history would be a significant factor contributing to your retinal detachment, the records of treating physicians which we reviewed make frequent reference to your prior history of eye problems in explaining the retinal detachment in September 1996. . . .

Since this policy, as quoted previously, does not pay Accident Insurance Benefits for a loss which in any way results from sickness, disease, or bodily infirmity, we have concluded that no benefits for accidental loss of sight are payable under the terms of [the] Policy. . . .

Should you have any information which would prove contrary to our findings, please submit it to the undersigned. We would be pleased to review any objective information you would wish to submit.

[*See* Defendant's Ex. C (emphasis added).]

Ms. Mendicino's letter further advised Plaintiff of his right to request a review of the denial by writing to her within 60 days of receipt of her letter and to state the reasons why he felt the claim should not have been denied. *Id.* Plaintiff was further advised to include with his request for review an documentation he felt supported his claim. *Id.*

On December 8, 1997, Defendant received a letter from Plaintiff's attorney seeking reconsideration of the denial of Plaintiff's claim based upon what the attorney perceived to be ambiguous policy language in the general definitions of "accident" and "injury" provided at the beginning of Liggett's Group Insurance Plan brochure.[3] This "appeal" was denied on January 8, 1998. [*See* Defendant's Ex. D.]

On August 27, 1999, Plaintiff filed a three-count Complaint in Wayne County Circuit Court based upon LINA's denial of his claim for benefits. In Count I of the Complaint, Plaintiff alleged a claim of breach of contract. In Count II, Plaintiff alleged that confusion was created in the terms of insurance policy which led him to believe that his pre-existing conditions would not affect his eligibility for accident benefits and that by creating this alleged confusion, Defendant violated the Michigan Consumer Protection Act. Finally, in Count III, Plaintiff claims that because he timely submitted a proof of claim and because Defendant did not timely pay him his benefits, he is entitled to 12% interest on the overdue benefits under the Michigan Uniform Trade Practices Act.

LINA timely removed Plaintiff's action to this Court alleging federal question jurisdiction—that Plaintiff's Complaint, seeking to recover benefits under his employer's group insurance plan, is completely preempted under the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiff subsequently moved to remand contending that his Complaint is not preempted under ERISA because laws regulating insurance are not preempted under that statute. Defendant responded opposing Plaintiff's Motion to Remand and then subsequently moved for summary judgment.

## III. DISCUSSION

### A. PLAINTIFF'S COMPLAINT WAS PROPERLY REMOVED TO FEDERAL COURT

█ As indicated above, Plaintiff contends that removal is improper arguing that state laws that regulate insurance are not preempted under ERISA. As an initial matter, the Court notes that in making this argument, Plaintiff entirely ignores

---

**3.** On the second page of the Liggett Plan brochure, [Defendant's Ex. A; Plaintiff's Ex. 2], "Accident" is defined as "A sudden unforeseeable external event that causes bodily injury to an Insured while coverage is in force under the Policy." "Injury" is defined as "Any accidental loss or bodily harm that results directly or indirectly of all other causes from an Accident."

the fact that Count I of his Complaint is a pure "breach of contract" claim implicating no law "regulating insurance." It is clear from the face of Plaintiff's Complaint that his claim of "breach of contract" is preempted under ERISA.

Plaintiff alleges in his Complaint that he is seeking to recover benefits which he claims he is entitled to pursuant to a "Group Insurance Plan" under which he was insured by Defendant "as part of his employment with the University Liggett School." [Complaint ¶¶ 5.] Liggett's Group Insurance Plan, being an insurance plan provided by Plaintiff's employer, is clearly an "employee benefit plan" as defined in ERISA.

With certain exceptions not relevant here, ERISA preempts *any* state law action that "relates to" an employee benefit plan. Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), permits a party "to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Since Plaintiff seeks to recover benefits allegedly due to him under the plan, his claim for such benefits arise under § 502(a)(1)(B) and are preempted by federal law.

Section 514 of ERISA explicitly provides for broad federal preemption in the area employee benefits:

(a) Except as provided in subsection (b) of this section [provisions not relevant here], the provisions of this sub-chapter and sub-chapter III of this sub-chapter shall supersede any and all state laws insofar as they may now or here-after relate to any employee benefit plan . . . .

   \*    \*    \*    \*    \*    \*

(c) For purposes of this section:

   (1) The term "state law" includes all laws, decisions, rules, regulations or other State action having the effect of law, of any State.

29 U.S.C. § 1144(a) and (c).

Furthermore, Section 502(f) of ERISA provides:

The district courts of the United States shall have jurisdiction, without respect to the amount in controversy or the citizenship of the parties, to grant the relief provided for in subsection (a) of this section in any action.

29 U.S.C. § 1132(f).

Notwithstanding the absence of any reference to ERISA or federal law on the face of Plaintiff's Complaint, the propriety of removal of cases that "relate to" employee benefits based on ERISA preemption under the "complete preemption" doctrine was made clear by the United States Supreme Court in *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63–64, 107 S.Ct. 1542, 1546–1547, 95 L.Ed.2d 55 (1987). In *Taylor*, the Plaintiff alleged in his complaint that he was seeking "compensatory damages for money contractually owed [to him], compensation for mental anguish caused by breach of this contract, as well as immediate reimplimentation of all benefits and insurance coverages [he] is entitled to." Taylor also asserted claims for wrongful termination of his employment and for wrongfully failing to promote him in retaliation for having filed a worker's compensation claim. The defendants removed the suit to federal court alleging federal question jurisdiction over the disability benefits breach of contract claims by virtue of ERISA and pendent jurisdiction over the remaining claims. The Court found the case properly removable explaining:

Taylor's common law contract and tort claims are pre-empted by ERISA. This lawsuit "relate[s] to [an] employee benefit plan." It is based upon common law of general application that is not a law regulating insurance. Accordingly, the suit is pre-empted by § 514(a) and is not saved by § 514(b)(2)(A). Moreover, as a suit by a beneficiary to recover benefits from a covered plan, it falls directly under § 502(a)(1)(B) of ERISA, which provides an exclusive federal cause of action for resolution of such disputes.

481 U.S. at 62, 107 S.Ct. 1542 (citations omitted).

Specifically with respect to removal, the *Taylor* Court held:

[T]he touchstone of the federal district court's removal jurisdiction is not the "obviousness" of the pre-emption defense but the intent of Congress. Indeed, as we have noted, even an "obvious" pre-emption defense does not, in most cases, create removal jurisdiction. In this case, however, *Congress has clearly manifested an intent to make causes of action within the scope of the civil enforcement provisions of § 502(a) removable to federal court.*

*Id.* at 66, 107 S.Ct. 1542.

The foregoing discussion makes clear that Plaintiff's Motion to Remand has no merit. Removal of Plaintiff's Complaint, by application of the complete preemption doctrine and the preemption of at least Plaintiff's Breach of Contract claim under

ERISA was proper. Accordingly, Plaintiff's Motion to Remand will be denied.

## B. *ALL OF PLAINTIFF'S CLAIMS IN THIS ACTION ARE PREEMPTED UNDER ERISA*

Plaintiff's Motion to Remand makes clear that Plaintiff has confused the doctrine of "complete preemption" which is a removal doctrine, with what may be called "ordinary preemption." The latter doctrine, however, is also implicated in this case because it determines whether any of Plaintiff's statutory state law causes of action may stand separate and apart from ERISA.

Plaintiff argues that his Michigan Consumer Protection Act claims of unlawful fraudulent misrepresentation[4] and his claim for 12% interest on unpaid benefits under the Michigan Uniform Trade Practices Act[5] are "laws which regulate insurance" and as such, are not subject to

---

**4.** Specifically, in Count II of his Complaint, Plaintiff alleges that Defendant violated Section 3(1)(a), (n), (bb) and (cc) of the Act, M.C.L. § 445.903(1)(a), (n), (bb) and (cc). These provisions provide as follows:

Sec. 3. (1) Unfair, unconscionable or deceptive methods, acts or practices in the conduct of trade or commerce are unlawful and are defined as follows:

(a) Causing a probability of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services.

\* \* \* \* \* \*

(n) Causing a probability of confusion or of misunderstanding as to the legal rights, obligations, or remedies of a party to a transaction.

\* \* \* \* \* \*

(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is. (cc) Failing to reveal facts which are material to the transaction in light of representations of fact made in a positive manner.

M.C.L. § 445.903(1).

**5.** Section 2006 of the Uniform Trade Practices Act, M.C.L. § 500.2006, which Plaintiff

relies upon as the basis of his claim in Count III, provides in pertinent part as follows:

(1) A person must pay on a timely basis to its insured [or] an individual... directly entitled to benefits under its insured's contract of insurance... the benefits provided under the terms of its policy, or, in the alterative, the person must pay to its insured [or] an individual... directly entitled to benefits under its insured's contract of insurance... 12% interest as provided in subsection (4), on claims not paid on a timely basis. Failure to pay claims on a timely basis or to pay interest on claims as provided in subsection (4) is an unfair trade practice unless the claim is reasonably in dispute.

\* \* \* \* \* \*

(3) ... [A] claim shall be deemed to be paid on a timely basis if paid within 60 days after receipt of proof of loss by the insurer.... (4) When benefits are not paid on a timely basis the benefits paid shall bear simple interest from a date 60 days after satisfactory proof of loss was received by the insurer at the rate of 12% per annum... The interest shall be paid in addition to and at the time of payment of the loss....

M.C.L. § 500.2006(1), (3) and (4).

ERISA preemption by virtue of ERISA's "savings clause."

Quoting *FMC Corp. v. Holliday*, 498 U.S. 52, 56–57, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990), Plaintiff argues

> An insurance company which insures a plan remains an insurer for purposes of state laws "purporting to regulate insurance."... The insurance company is therefore not relieved from state insurance regulation. The ERISA plan is consequently bound by state insurance regulations insofar as they apply to the plan's insurer.

498 U.S. at 61, 111 S.Ct. 403.

Plaintiff, however, has not provided the Court with any reasoning or any authority for finding that the provisions of the Michigan Consumer Protection Act which he contends were violated by Defendant or the interest provision of the Uniform Trade Practices Act should be deemed to be laws "purporting to regulate insurance." Indeed, the only argument Plaintiff makes is that because the Liggett plan is an insured (as opposed to a self-funded) plan, under *FMC*, the plan is subject to laws which regulate insurance.

The precise issue addressed by the Court in *FMC* was whether Pennsylvania's Motor Vehicle Financial Responsibility Law—which precludes reimbursement from an insurance claimant's tort recovery for benefit payments by program, group contract or other arrangement—prohibited a self-funded employee health care plan from enforcing its subrogation rights under the plan with respect to a plan member's recovery on a negligence action to recoup the portion of medical expenses paid by the plan. It was not disputed that the Pennsylvania law fell within ERISA's insurance regulation savings clause. As the Supreme Court observed:

> There is no dispute that the Pennsylvania law falls within ERISA's insurance savings clause which provides, "*[except as provided in the deemer clause]*, nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance," § 514(b)(2)(A), 29 U.S.C. § 1144(b)(2)(A) (emphasis added). **Section 1720 [of Pennsylvania's Motor Vehicle Financial Responsibility Law] directly controls the terms of insurance contracts by invalidating any subrogation provisions that they contain. It does not merely have an impact on the insurance industry; it is aimed at it. This returns the matter of subrogation to state law.**

498 U.S. at 60–61, 111 S.Ct. 403 (citations omitted and emphasis added).

However, whether the Pennsylvania law regulated insurance so as to come within the scope of the "savings" clause was not the issue presented to the Court for review in *FMC*. Rather, the issue was the effect of ERISA's "deemer" clause.

ERISA's "deemer" clause, 29 U.S.C. § 1144(b)(2)(B) provides, in pertinent part, "neither an employee benefit plan... nor any trust established under such a plan, shall be deemed to be an insurance company... or to be engaged in the business of insurance... for purposes of any law of any state purporting to regulate insurance companies [or] insurance contracts." The issue in *FMC* was whether the "deemer" clause exempted self-funded ERISA plans from state laws that regulate insurance. The Supreme Court held that it did, and accordingly, held that ERISA preempted the application of the Pennsylvania Motor Vehicle Financial Responsibility Law to the self-funded FMC employee health care plan.

Plaintiff apparently believes that under *FMC*, ERISA would preempt his Michigan statutory claims only if the Liggett plan were "self-funded." Since it is not, Plaintiff contends that there can be no ERISA preemption of his Michigan Consumer Protection Act and Uniform Trade Practices Act claims. *FMC*, however, did not sweep so broadly and, in fact, as indicated, no analysis of was done by the Court in that case to determine whether the Pennsylvania law "regulated insurance" because that issue was not contested.

Therefore, the issue to be determined here is whether the provisions of the Michigan Consumer Protection Act and the Michigan Uniform Trade Practices Act relied upon by Plaintiff in this case "regulate insurance." The Supreme Court has provided some guidance for deciding this issue.

In *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), the Supreme Court set out two tests for determining whether a state law falls under ERISA's savings clause because it "regulates insurance." The first test is a "common-sense view." 481 U.S. at 48, 107 S.Ct. at 1553 (quoting *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 740, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728 (1985)). According to the *FMC* Court, applying a "common sense view,"

> Laws that purportedly regulate insurance companies or insurance contracts are laws having the "appearance of" regulating or "intending" to regulate insurance companies or contracts.

498 U.S. at 63, 111 S.Ct. at 410 (quoting Black's Law Dictionary 1236 (6th ed.1990)). *See also, UNUM Life Ins. Co. of America v. Ward*, 526 U.S. 358, 119 S.Ct. 1380, 143 L.Ed.2d 462 (1999) (the Court asks first "whether the law in question 'fits a common-sense understanding of insurance regulation.' ")

Once a common-sense determination has been made, the Supreme Court has directed that courts should consider the three factors used to determine whether a law fits within the "business of insurance" as that phrase is used in the McCarran–Ferguson Act, 15 U.S.C. § 1011 *et seq.* Those factors are (1) whether the regulation has the effect of transferring or spreading a policyholder's risk; (2) whether the regulation is an integral part of the policy relationship between the insurer and the insured; and (3) whether the regulation is limited to entities within the insurance industry. *Pilot Life*, 481 U.S. at 48–49, 107 S.Ct. 1549; *Ward*, 119 S.Ct. at 1386. However, the *Ward* Court emphasized that it is not required that a state law satisfy all three of these factors be satisfied in order to regulate insurance. *Id.* at 1389. Rather, these factors are "considerations to be weighed" in determining whether the law regulates insurance. *Id.* Moreover, "none of these criteria is necessarily determinative in itself."

Applying *Ward* to the provisions of the two Michigan statutes implicated in Plaintiff's Complaint, first under a "common sense view," there is nothing in the four provisions of the Michigan Consumer Protection Act or the interest provision of the Uniform Trade Practices Act to suggest that any of these statutory provisions "regulate" insurance.[6]

6. The Court acknowledges that the Michigan Supreme Court recently determined that a plaintiff may maintain an action under the Michigan Consumer Protection Act against an insurance company (1) for a declaratory judgment, (2) to enjoin an act or practice that is unlawful under Section 903 of the Act, or (3) to recover "actual damages" suffered as a result of violation of the act but only if the claim "involve[s]" allegations of misconduct made unlawful under chapter 20 of the Insurance Code," M.C.L. § 500.2001 *et seq. See, Smith v. Globe Life Ins. Co.*, 460 Mich. 446, 597 N.W.2d 28 (1999). (Prior to the *Smith* decision, it was generally accepted that no private right of action under the Michigan Consumer Protection Act could be maintained against an insurance company.) Title 20 is generally referred to as the "Uniform Trade Practices Act." Section 2005 of Title 20, M.C.L. § 500.2005, enumerates unlawful "unfair or deceptive acts or practices in the business of insurance," and includes "misrepresent[ing] the terms, benefits, advantages and conditions of an insurance policy," 500.2005(a). Thus, to the extent that Plaintiff alleges in Count II of his Complaint claims of "misrepresentation" of the "terms, benefits and conditions" of the policy, he has made out a claim under the Michigan Consumer Protection Act. But, as discussed *infra*, this "tying" of Plaintiff's Consumer Protection Act claim to conduct that is declared "unlawful" in the Uniform Trade Practices Act section of the Michigan Insurance Code does not mean that the provisions prohibiting against fraudulent, misleading and deceptive conduct and statements under the Consumer Protection Act or the Uniform Trade Practices Act "regulate" insurance.

As indicated above, Plaintiff's Consumer Protection Act claim, even, as noted in note 6, construing it as alleging a claim for violation of the deceptive trade practices prohibitions of the Uniform Trade Practices Act, arises out of allegations of "misrepresentation" and fraudulent, deceptive statements contained in the Liggett plan and LINA policy.

As the title "Uniform Trade Practices Act" suggests, this is an act that is not unique to Michigan. A number of courts have been called on to determine whether claims of "misrepresentation," "deceptive practices," and "negligent handling of claims" brought under state Uniform Trade Practices statutes are exempted from ERISA preemption by virtue of the savings clause, and these courts have uniformly held that they are not. *See, e.g., DeBruyne v. Equitable Life Assurance Society of the United States,* 920 F.2d 457 (7th Cir.1990) (ERISA held to preempt application of New York Insurance Law's Uniform Trade Practices provisions to challenge alleged misrepresentations in plan documents); *Custer v. Pan American Life Ins. Co.,* 12 F.3d 410 (4th Cir.1993) (plaintiff's claims under West Virginia's Uniform Trade Practices Act based on alleged oral representations about insurance coverage held not saved from preemption by the savings clause); *Ramirez v. Inter-Continental Hotels,* 890 F.2d 760, 763–64 (5th Cir.1989) (employee's suit to recover benefits allegedly due him under an employee group medical plan was not rescued from preemption to extent suit was based upon Texas Insurance Code section furnishing private right of action to persons injured by enumerated unfair methods of competition and unfair and deceptive acts or practices in business of insurance on theory the Texas statute regulates insurance within meaning of ERISA savings clause); *Kanne v. Connecticut Gen. Life. Ins. Co.,* 867 F.2d 489, 494 (9th Cir.1988) (same for California action based on California's version of the Uniform Trade

Practices Act); *In re Life Ins. Co. of North America,* 857 F.2d 1190 (8th Cir. 1988) (same for vexatious refusal to pay claim under a Missouri statute).

As explained by the Seventh Circuit in its well-reasoned decision in *DeBruyne v. Equitable, supra:*

> Count VI, the last of plaintiffs' claims, is based on section 4226 of the New York Insurance Law. That statute provides:
>
> > No insurer authorized to do in this state the business of life, or accident and health insurance, or to make annuity contracts shall:
> >
> > (1) issue or circulate, or cause to permit to be issued or circulated on its behalf, any illustration, circular, statement or memorandum misrepresenting the terms, benefits or advantages of any of its policies or contracts.... [7]
>
> N.Y.Ins.Law § 4226(a)....
>
> This particular application of section 4226(a)(1) has been preempted by ERISA.
>
> \*    \*    \*    \*    \*    \*
>
> Congress, when passing ERISA, envisioned that it would "reserv[e] to Federal authority the sole power to regulate the field of employee benefit plans." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 46, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987) (citing 120 Cong.Rec. 29, 197 (1974)). In order to assist that massive undertaking, Congress specified that ERISA would supersede "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. S 1144(a). The only exception to that broad preemptive scope is for those laws that regulate insurance, banking, or securities. *Id.* § 1144(b)(2)(A) (savings clause).
>
> Thus, our analysis centers around two basic questions. First, does section 4226(a)(1) "relate to" employee benefit plans? Second, if section 4226(a)(1)

---

7. This is substantially the same language used in Section 2005 of the Michigan Uniform Trade Practices Act.

does relate to employee benefit plans, is it saved by the fact that it regulates insurance?

As to the first question, the answer is clearly yes. As the Supreme Court has acknowledged, the expansive preemption provisions of ERISA are designed to "establish pension plan regulation as exclusively a federal concern." *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981). Thus, "[t]he phrase 'relate to' [is] given its broad common-sense meaning, such that a state law 'relate[s] to' a benefit plan 'in the normal sense of the phrase, if it has a connection with or reference to such a plan.'" *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 739, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728 (1985) (quoting *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983)). Here, plaintiffs use section 4226(a)(1) to challenge representations made in Plan documents, and it "cannot be gainsaid" that such an application relates to the Plan. *See Perkins v. Time Ins. Co.,* 898 F.2d 470, 473 (5th Cir. 1990).

As to the second question, the answer is clearly no. The Supreme Court in *Pilot Life* set out two tests for determining whether a state law falls under ERISA's savings clause because it regulates "insurance." The first test is a "'common-sense view.'" *Pilot Life,* 481 U.S. at 48, 107 S.Ct. at 1553 (quoting *Metropolitan Life,* 471 U.S. at 740, 105 S.Ct. at 2389). The second test, which mimics the "business of insurance" test under the McCarran–Ferguson Act, 15 U.S.C. SS 1011–1015, is a three-factor analysis:

> "'[W]hether the practice has the effect of transferring or spreading a policyholder's risk'";
>
> "'[W]hether the practice is an integral part of the policy relationship between the insurer and the insured'"; and
>
> "'[W]hether the practice is limited to entities within the insurance industry.'"

*Pilot Life,* 481 U.S. at 48–49, 107 S.Ct. at 1553 (quoting *Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 3009, 73 L.Ed.2d 647 (1982)). In addition to the two "insurance" tests, the Court used the language, structure, and legislative history of ERISA as an additional basis for preempting state law. *Id.* 481 U.S. at 51–57, 107 S.Ct. at 1554–58.

Assuming that a common sense view of section 4226(a)(1) leads to the conclusion that it regulates insurance, the statute still fails the more rigorous McCarran–Ferguson test. Under that test, it is not enough that a statute has some specific direction toward the insurance industry. The McCarran–Ferguson analysis looks at whether a statute regulates the "business of insurance," not whether the statute regulates the "business of insurance companies." *See SEC v. National Sec., Inc.,* 393 U.S. 453, 459, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969).

And with that distinction in mind, we turn to the first factor in the McCarran–Ferguson test. As the Supreme Court noted in *Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 211, 99 S.Ct. 1067, 1073, 59 L.Ed.2d 261 (1979), the primary features of an insurance contract are the spreading and underwriting of the policyholder's risk. Here, however, section 4226(a)(1) does not pool and average policyholders' risks. *Compare Metropolitan Life,* 471 U.S. at 743, 105 S.Ct. at 2391 (mandated-benefit statutes "intended to effectuate the legislative judgment that the risk of mental-health care should be shared"); *see generally* R. KEETON, INSURANCE LAW S 1.2(b), at 3–9 (1971). Instead, the statute "forces the insurer to bear the legal risks associated with [fraudulent] policy language." *See McMahan v. New Eng. Mut. Life Ins. Co.,* 888 F.2d 426, 429 (6th Cir.1989). As such, the statute fails the first prong of McCarran–Ferguson test.

Section 4226(a)(1) also fails the third prong of the McCarran–Ferguson test. Even if associated with the insurance industry by virtue of its placement in New York's insurance code, section 4226(a)(1) merely codifies general principles of common law fraud in an attempt to limit unfair trade practices. *See* 68 N.Y.JUR.2D Insurance § 40 (1963); *see generally* 43 AM.JUR.2D Insurance § 35 (1982). Indeed, the main difference (for our purposes) between common law fraud and section 4226(a)(1) is that New York has tacked the word "insurance" onto the latter. See generally W. KEETON, D. DOBBS, R. KEETON & D. OWEN, PROSSER AND KEETON ON TORTS SS 105–110 (5th ed. 1984 & Supp.1988). And under those circumstances, the conclusion that common law fraud does not regulate insurance, *see Pilot Life*, 481 U.S. at 51, 107 S.Ct. at 1554 (preempting cause of action under Mississippi common law of general application), would be difficult, if not impossible, to reconcile with the conclusion that section 4226(a)(1) does regulate insurance.

\* \* \* \* \* \*

Section 4226(a)(1) also interferes with ERISA's carefully crafted fiduciary liability provision. Plaintiffs hope to use the New York statute as a basis for a class action seeking redress for alleged misrepresentations contained in Plan documents. Yet ERISA already contains a comprehensive fiduciary duty section that requires fiduciaries to manage plans in accordance with plan documents, *see* 29 U.S.C. S 1104(a)(1)(B), and plaintiffs allege a violation of that statute in the first count of their complaint. As used by plaintiffs, the state law claim and the ERISA fiduciary duty claim are virtually the same: alleging that a fiduciary included fraudulent representations in plan documents is the same as alleging that a fiduciary failed to manage a plan in accordance with those same representations. And whatever the exact parameters of the savings clause, it cannot be read to save an application of a state statute that mimics ERISA's fiduciary liability provision. *See Shaw*, 463 U.S. at 98, 103 S.Ct. at 2900; *Perry v. P\*I\*E Nationwide Inc.*, 872 F.2d 157, 161 (6th Cir.1989), *cert. denied*, 493 U.S. 1093, 110 S.Ct. 1166, 107 L.Ed.2d 1068 (1990).

\* \* \* \* \* \*

In summary, an analysis of section 4226(a)(1) indicates that the statute does not regulate "insurance" as that term is defined under the McCarran–Ferguson test. The language, structure, and legislative history of ERISA only confirm that conclusion. As such, the specific application of section 4226(a)(1) advocated by plaintiffs is preempted.

920 F.2d at 468–70.

Turning then to Plaintiff's Consumer Protection Act and Uniform Trade Practices Act claims in this action, and examining those claims under the the McCarran–Ferguson factors: there is no policyholder risk transferring or spreading implicated and as the cases discussed above make clear, the particular provisions upon which Plaintiff relies are certainly not laws limited to entities within the insurance industry. Rather, they are well-established common law fraudulent misrepresentation claims, merely codified in the Insurance Code. While admittedly the "no deceptive trade practices" rules are implicitly an integral part of a policy relationship between the insurer and the insured, as indicated there is nothing within the statutory provisions to establish that it is intended to "regulate" insurance.

For these reasons, the Court finds that Plaintiff's claims under the Michigan Consumer Protection Act and the Uniform Trade Practices Act are preempted under ERISA. Therefore, since Plaintiff ultimately seeks to recover benefits allegedly due to him under the plan, the Court will treat Plaintiff's Complaint as a claim under § 502(a)(1)(B) of ERISA.

## C. STANDARD AND SCOPE OF JUDICIAL REVIEW IN ERISA CASES

■ The Supreme Court has ruled that the standard of review in ERISA cases is *de novo* unless the benefit plan gives the plan administrator discretion to determine eligibility for benefits or to construe plan terms:

> As this case aptly demonstrates, the validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue. Consistent with established principles of trust law, we hold that a denial of benefits challenged under Section 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

*Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). *See also, Wilkins v. Baptist Healthcare System, Inc.,* 150 F.3d 609, 616 (6th Cir.1998). There is nothing in the Liggett employee benefit plan which gives the administrator any degree of "discretionary authority" to determine eligibility for benefits or to construe the terms of the plan. Accordingly, this case calls for *de novo* review. When conducting a *de novo* review in an ERISA denial-of-benefits case, the District Court must take a "fresh look" at the administrative record but may not consider new evidence or look beyond the record that was before the plan administrator. *Wilkins, supra.*

## D. PLAINTIFF'S CLAIM WAS PROPERLY DENIED BY LINA

Upon *de novo* review, the Court finds no error in the plan administrator's denial of accidental death benefits.

In denying Plaintiff's claim, Defendant pointed to the following provisions of the Liggett Group Insurance Plan:

> The Insurance company will pay benefits for any of the losses listed below if an Employee is insured under the Policy for Accident Insurance on the date of an Accident. The loss must:
>
> 1. Be a result of bodily injuries caused directly, **and from no other causes,** by an Accident; and
> 2. Occur within 365 days of the Accident.
>
> \* \* \* \* \* \*
>
> The Insurance Company will not pay Accident Insurance Benefits for a loss which in any way results from ... sickness, disease or bodily infirmity; medical or surgical treatment; or bacterial or viral infection, no matter how contracted. (This does not include bacterial infection that is the natural and foreseeable result of an accidental bodily injury or accidental food poisoning.)

*See* Defendant's Ex. A.

■ The medical records of Plaintiff's own treating ophthalmic specialist, Dr. Joondeph, establish that Plaintiff cannot satisfy either of the foregoing provisions— i.e., the evidence fails to establish that his retina detached as the result of his heavy lifting of books on September 5, 1996 **and no other cause,** and he cannot show that the loss did not **in any way result from disease or bodily infirmity or medical or surgical treatment.**

As noted by Ms. Mendicino in her letter denying Plaintiff's claim, Dr. Joondeph's records are replete with discussions of Plaintiff's prior problems with and surgeries on his right eye. Further, prior to operating on Plaintiff the first time on September 6, 1997, Dr. Joondeph found not only that Plaintiff had a detached retina, but also that he had PVR (proliferative vitreoretinopathy), a disease in which scar tissue grows on the surface of the retina which can cause the retina to detach. *See note 2, supra.*

As Dr. Joondeph and Defendant's expert, Dr. Adams both observed, Plaintiff's history of traumatic cataract in the early 80s, followed by Yag laser capsulotomy, eye muscle surgery, and secondary intraocular lens implant all created an increased risk for a retinal detachment and impairment of his sight in his right eye. This

history, coupled with Dr. Joohdeph's finding of PVR prior to performing the first retinal re-attachment on the very next day after Plaintiff lifted the heavy books at work, clearly establish ample support for Dr. Adams' conclusion that Plaintiff's pre-September 5, 1996 history of ocular surgeries was a "significant factor contributing to the retinal detachment and current loss of vision." [*See* Dr. Adams' report, at Defendant's Ex. F.]

Based upon its *de novo* review of the records of Plaintiff's claim, including the medical records of Plaintiff's own treating surgeon, the Court agrees with Defendant LINA's determination that the evidence submitted by Plaintiff in support of his claim failed to establish that his retina detached entirely as the result of an accident (i.e., his heavy lifting of books) on September 5, 1996 and no other cause, and that his loss of sight did not in any way result from a pre-existing disease or bodily infirmity.[8]

### CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Plaintiff's Motion to Remand is DENIED.

IT IS FURTHER ORDERED that Defendant's "Motion for Summary Judgment" to affirm Defendant's denial of Plaintiff's claim for benefits is GRANTED. Accordingly,

IT IS FURTHER ORDERED that Plaintiff's Complaint be, and hereby is, DISMISSED in its entirety, with prejudice.

---

**8.** The only medical record which Plaintiff can point to contradicting this conclusion is a letter written by Dr. Julian Nussbaum on June 20, 1997, i.e., 10 months after Dr. Joondeph's surgical treatment of Plaintiff's detached retina, and 2½ months after Plaintiff filed his claim for benefits. Dr. Nussbaum states in his letter:

> I assumed the care of Mr. Biondo on March 18, 1997. Prior to that time he had been cared for by Brian Joondeph, M.D. and copies of his records prior to March 1997 can be obtained through his office.
> As to whether or not Mr. Biondo has any systemic diseases which might have con-

### JUDGMENT

The Court having this date entered an Opinion and Order granting Defendant's Motion for Summary Judgment and dismissing Plaintiff's Complaint in its entirety, with prejudice,

NOW, THEREFORE,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that a JUDGMENT OF DISMISSAL, with prejudice be, and hereby is, entered.

tributed to his retinal detachment, I see no evidence of this in my records.
[*See* Plaintiff's Ex,. 6.]

However, there is nothing in Dr. Nussbaum's letter that suggests that he has ever reviewed, let alone seen, Dr. Joondeph's records and, since Dr. Nussbaum did not treat Plaintiff at the time of his retinal detachment, the Court finds Dr. Nussbaum's finding of "no evidence" in his March—June 1997 records of any "systemic diseases" which might have contributed to Plaintiff's retinal detachment, insufficient to establish that the Plan administrator erred in denying benefits.